DAVID L. OSIAS (BAR NO. 091287)
E-Mail:  dosias@allenmatkins.com
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
One America Plaza
600 West Broadway, 27th Floor
San Diego, California 92101-0903
Phone:  (619) 233-1155
Fax:  (619) 233-1158

Attorneys for Plaintiffs
Stephen Timothy Buynak, Jr. and Gloria Ann
Buynak, as Trustees of The Buynak 1991 Family
Revocable Trust

*Additional attorneys listed on next page*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| STEPHEN TIMOTHY BUYNAK, JR. and GLORIA ANN BUYNAK, as TRUSTEES OF THE BUYNAK 1991 FAMILY REVOCABLE TRUST, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR; UNITED STATES BUREAU OF RECLAMATION; CACHUMA OPERATION & MAINTENANCE BOARD; CARPINTERIA VALLEY WATER DISTRICT; CITY OF SANTA BARBARA; GOLETA WATER DISTRICT; and MONTECITO WATER DISTRICT, <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF TO ENFORCE PLAINTIFFS' RIPARIAN WATER RIGHTS** |

ALEXANDER J. DOHERTY (BAR NO. 261552)
E-Mail:  adoherty@allenmatkins.com
ALLEN MATKINS LECK GAMBLE
   MALLORY & NATSIS LLP
Three Embarcadero Center, 12th Floor
San Francisco, California  94111-4074
Phone:  (415) 837-1515
Fax:  (415) 837-1516

TARA E. PAUL (BAR NO. 305366)
E-Mail:  tpaul@allenmatkins.com
ALLEN MATKINS LECK GAMBLE
   MALLORY & NATSIS LLP
865 South Figueroa Street, Suite 2800
Los Angeles, California 90017-2543
Phone:  (213) 622-5555
Fax:  (213) 620-8816

**JURISDICTION**

1.      This action states claims arising under the federal Reclamation Law and from agency actions associated with the execution and implementation of that law.  This Court therefore has jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 701, et seq., because the claims arise under federal law, specifically section 8 of the Reclamation Act of 1902 (43 U.S.C. § 383), for which there is no other adequate remedy.  In addition, this Court has authority to issue declaratory judgments pursuant to 28 U.S.C. § 2201 and to issue injunctive relief pursuant to Federal Rule of Civil Procedure 65.

2.      Sovereign immunity is waived under the Administrative Procedure Act for lawsuits against agencies and officials of the United States that seek relief other than money damages.  5 U.S.C. §§ 701(b)(1), 702.

3.      This Court has supplemental jurisdiction over the state law claim alleged herein pursuant to 28 U.S.C. § 1367 because it is so related to the federal claims over which this Court has jurisdiction that they form part of the same case and controversy under Article III of the United States Constitution.

**VENUE**

4.      Venue is proper in this district under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703, as a substantial part of the acts or omissions giving rise to the claims occurred in this district.

**BRIEF OVERVIEW OF THE CASE**

5.      The plaintiffs in this action have riparian water rights to Lauro Creek in Santa Barbara County, California.  Certain defendants have violated – and continue to violate – those water rights by damming the creek upstream from the plaintiffs' property (thereby preventing the creek's natural flow from proceeding downstream) and then redirecting that water for use by the named water district defendants.  The plaintiffs' requests for the release of Lauro Creek water through the dam for domestic and farm irrigation uses have been rejected or ignored.  This complaint

requests declaratory and injunctive relief to cause the delivery of riparian water to the plaintiffs, as required by law and the water use permits obtained by the United States Bureau of Reclamation relating to the operation of the dam.

## THE PARTIES

6.      Plaintiffs Stephen Timothy Buynak, Jr. and Gloria Ann Buynak (the "Buynaks") are and, at the time of the acts alleged herein, were individual citizens of the United States residing in the County of Santa Barbara in the State of California.  The Buynaks are trustees of the Buynak 1991 Family Revocable Trust, which holds property adjacent to Lauro Creek and therefore holds all property rights appurtenant thereto, including riparian rights to put Lauro Creek water to beneficial use on this adjacent land.

7.      Defendant United States Department of the Interior is one of the executive departments of the federal government.

8.      Defendant United States Bureau of Reclamation (the "Bureau") is a federal agency within the United States Department of the Interior.  The Bureau is charged with various duties and responsibilities, including operating and maintaining federal reclamation projects under the Reclamation Law, including the Cachuma Project, which is discussed below.

9.      Defendant Cachuma Operation & Maintenance Board ("COMB") is a California Joint Powers Agency.  The Bureau has contractually delegated its authority to operate, repair, and maintain the Cachuma Project to COMB.

10.      Defendant Carpinteria Valley Water District ("CVWD") is a California county water district established under California Water Code § 33000 *et seq*., and one of the four constituent members of COMB.

11.      Defendant City of Santa Barbara ("City") is a city in Santa Barbara County and one of the four constituent members of COMB.

12.      Defendant Goleta Water District ("GWD") is a California county water district established under California Water Code § 30000 *et seq*., and one of the four

1  constituent members of COMB.

2      13.      Defendant Montecito Water District ("MWD") is a California county

3  water district established under California Water Code § 30000 *et seq*., and one of

4  the four constituent members of COMB.

5      14.      Collectively, CVWD, City, GWD and MWD are sometimes referred to

6  herein as the "Districts."

7  ## GENERAL ALLEGATIONS

8  ### The Riparian Water Rights Appurtenant to Plaintiffs' Farm

9      15.      The Buynaks are small farmers who own approximately 7.82 acres of

10  land located in Santa Barbara County (the "Property").  They purchased the parcels

11  constituting the Property over the years 1988-2003.

12      16.      The Buynaks use the Property as residences for their family and to

13  farm.  There are three residences on the Property.  The Buynaks have created an

14  approximately 328-tree orchard comprised of several types of fruit and nut trees,

15  including almond, apple, apricot, avocado, banana, blackberry, cherry, fig, grape,

16  and many others.  In addition, the Buynaks grow a variety of flowers to harvest for

17  utilization in various botanical products that are sold.  Approximately three acres are

18  currently devoted to these agricultural activities.  The Property is irrigated with an

19  efficient water distribution system.

20      17.      The Property overlies groundwater.  Historically, the Buynaks have

21  relied on groundwater for household use and for irrigation of the farm.  The

22  groundwater was extracted through a 380-foot deep well on the Property.

23  Depending on the occurrence of wet or dry years, the farm currently uses about 10

24  to 12 acre-feet ("AF") of water per year.

25      18.      However, the well is no longer producing a sufficient and reliable

26  supply to meet the Buynaks' current irrigation needs.  In addition, the Buynaks

27  intend to expand the acreage of irrigated land by an additional three acres.  The

28  Buynaks' ongoing expansion of the farm will roughly double their reasonable and

1  beneficial water needs to an estimated total of 25 AF per year.

2      19.    All parcels of the Property are contiguous to a natural creek called

3  Lauro Creek.  Lauro Creek is a short intermittent stream that is approximately two

4  miles long.  Its headwaters are in a small canyon on the south flank of the Santa

5  Ynez Mountains at an elevation of 1,000 feet.  The stream flows southwesterly until

6  it debouches onto the Santa Barbara Plain.  According to the California State Water

7  Resources Control Board ("State Board"), Lauro Creek has a historical average

8  annual flow of 73 AF of water per year, with an estimated maximum annual average

9  runoff of 275 AF per year (i.e., during particularly rainy years).

10      20.    The Buynaks need and desire to augment their irrigation water supply

11  and reduce their dependance on groundwater by exercising their riparian rights to

12  divert and to beneficially use water from Lauro Creek.  Riparian rights are water

13  rights to use the natural flow of water on riparian land for reasonable and beneficial

14  use.  Riparian land is land that is contiguous to a river, stream, creek, lake, or other

15  natural water body, or land that has preserved a riparian right after it has been

16  separated from such a water body. The Property is riparian land because, as noted

17  above, it is all contiguous to Lauro Creek.  The chain of title for the Property

18  indicates that there has been no severance of the riparian water rights from the

19  Property either by physical subdivision or grant deed.

20      21.    Under California water law, the Buynaks' riparian rights extend to the

21  natural flow of Lauro Creek, which they may use to the extent that they can put that

22  flow to reasonable and beneficial use on the Property.  As such, the nature of a

23  riparian right precludes it from being fixed in amount.  If the Buynaks are able to

24  put only 10 AF per year to reasonable and beneficial use, they may divert and use

25  only that amount.  If their reasonable needs increase to 25 AF per year, they may

26  increase their diversions and use to that amount.

27      22.    Although the farm has not been irrigated with diversions from Lauro

28  Creek in the past (i.e., due to the Buynaks' historic reliance on groundwater), a lack

of historic use does not result in abandonment, forfeiture, or loss of a riparian right. *See Herminghaus v. Southern California Edison Co.*, 200 Cal. 81, 95 (1926) ("The right to the flow of water is inseparably annexed to the soil, and passes through it, not as an easement or appurtenant, but as a parcel"); *Fall River Valley Irr. Dist. v. Mt. Shasta Power Corp.*, 202 Cal. 56, 65 (1927) (riparian water rights are part and parcel of land ownership); *Lux v. Haggin*, 69 Cal. 225, 391 (1886) ("Use does not create, and disuse cannot destroy or suspend the riparian right"). Accordingly, the Buynaks' riparian rights remain vested by virtue of their land ownership, even when or if those rights are unexercised.

### The Lauro Reservoir and The Cachuma Project

23. The Cachuma Project is a large-scale federal water project in the Santa Barbara/Santa Ynez region. The principal features of the Cachuma Project are Cachuma Dam, the Tecolote Tunnel, and the South Coast Conduit. Cachuma Dam is located on the Santa Ynez River and impounds water in Lake Cachuma from the Santa Ynez River watershed. Water from the lake is conveyed through the Tecolote Tunnel, through the Santa Ynez Mountains, and connects with the South Coast Conduit at the northwest end of Defendant GWD's service area. The South Coast Conduit carries water from west to east for the purpose of distributing it to the Districts along the way, and terminating in the Carpinteria Reservoir. There are three small regulating and storage reservoirs along the South Coast Conduit that are part of the Cachuma Project, one of which is Lauro Reservoir. Lake Cachuma water is diverted from the Conduit into Lauro Reservoir.

24. The Bureau built a dam on Lauro Creek in the 1950's, which created the Lauro Reservoir. The Lauro Dam receives runoff from a drainage area of 0.43 square miles, as well as the Lake Cachuma water for storage diverted from the South Coast Conduit. The Lauro Reservoir has a capacity of 640 AF, and is located on the South Coast Conduit.

25. The Buynaks' Property is downstream of the Lauro Dam and

Reservoir.  The Lauro Dam is able to block the full natural runoff from the Lauro Creek watershed, thereby almost entirely eliminating the creek's natural flow available to the Buynaks downstream, for use on their farm.  Indeed, no flow from the Lauro Creek watershed above the Dam ever reaches the creek below the Dam.  Instead, that water is captured and diverted, as detailed below.

26.     On information and belief, Lauro Reservoir is equipped with the necessary infrastructure to directly or indirectly release water through or around Lauro Dam into Lauro Creek upstream of the Buynaks' Property.  By releasing water in this manner, water could reach the Buynaks' Property and enable them to exercise their senior riparian rights.

## **The Bureau's Appropriative Water Rights Are Junior to The Buynaks' Riparian Rights**

27.     To construct the Lauro Dam and capture the natural flow of Lauro Creek, the Bureau was required by state and federal law to apply for and obtain an appropriative right and permit from the State Board.  *See* 43 U.S.C. § 383 (requiring the Secretary of the Interior, through the Bureau, to comply with state water law when seeking to appropriate water for Reclamation projects); *see also California v. United States*, 438 U.S. 645, 674 (1978) (holding that states may impose conditions on permits granted to the United States).  As relevant here, the Bureau applied for and obtained permits to appropriate water from Lauro Creek.  A true and correct copy of the State Board's order granting the Bureau's application is attached hereto as Exhibit 1 and incorporated by reference herein.  The two permits relating to Lauro Creek are Permit Numbers 11311 and 11312 (the "Permits").  True and correct copies of the Permits are attached hereto as Exhibits 2 and 3, respectively, and are incorporated herein by reference.

28.     The Permits provide the Bureau with the right to appropriate the natural flow of Lauro Creek for storage in Lauro Reservoir and subsequent use.  More specifically, the Permits allow the Bureau to store up to 500 AF per year in Lauro

Reservoir.  The amount of water to be appropriated under the Permits cannot exceed 15 cubic feet per second.  The water stored may be used for domestic, irrigation, municipal, and industrial uses.

29.    The Permits also provide that Lauro Reservoir is to be primarily used to provide regulatory and standby storage as well as a source of emergency water supply for the Districts.

30.    However, both the State Board's order granting the Permits and the Permits themselves expressly state that the Bureau's appropriation of water is "subject to vested rights," i.e., subject to the rights of all senior appropriators whose permits are older than the Bureau's, and riparian water rights holders whose rights are all senior as a matter of California water law.

31.    Therefore, as holders of riparian rights, the Buynaks' water rights are senior to the Bureau's appropriative water rights as a matter of California law, as well as under the express terms of the Bureau's Permits.  That means that the Bureau may only store or divert water from Lauro Creek if the natural flow of Lauro Creek is left available to meet the reasonable needs of the Buynaks as riparian rights holders.  In other words, there must be "surplus" or excess water above the Buynaks' use for the Bureau's appropriative rights to enable it to divert any water at all.  Surplus or excess water is that amount of a stream's natural flow that is not reasonably required for the beneficial use of the paramount, riparian rights holders, like the Buynaks.

**The Unlawful Diversion, Storage, And Discharge of Lauro Creek Water by The Bureau And The Cachuma Operation & Maintenance Board**

32.    The Cachuma Project is owned by the United States.  However, the Bureau has delegated its authority to operate and manage the project.  On September 12, 1949, the United States contracted with the Santa Barbara County Water Agency ("Water Agency") for delivery of water from the Cachuma Project for the benefit of

1   the Districts.[1]  On March 1, 1993, the Districts entered into a Joint Exercise of

2   Powers Agreement ("Joint Powers Agreement") to form COMB for a number of

3   stated purposes, including to facilitate a renewal of the original contract with the

4   United States and ensure continued delivery of water from the Cachuma Project to

5   the Districts.  Under that agreement, COMB is responsible for operating, repairing,

6   and maintaining the project.  However, the Buynaks are informed and believe, and

7   on that basis allege, that COMB takes direction from the Bureau as to what it may or

8   may not do.

9       33.    Pursuant to the Joint Powers Agreement, COMB has four member

10   agencies: Defendants CVWD, the City, GWD, and MWD.  COMB is governed by a

11   board of directors comprised of one representative from each of the four member

12   agencies.

13       34.    The Bureau and COMB have no right to prevent the natural flow of

14   Lauro Creek from reaching the Buynaks' Property in any amount less than what

15   would be sufficient to meet the Buynaks' current and prospective, beneficial

16   reasonable needs.  However, that is what they are unlawfully doing.

17       35.    As detailed above, the Buynaks' current and prospective water needs

18   total 25 AF per year when the farm expansion is completed.  25 AF per year is less

19   than one-third of Lauro Creek's average annual flow of 73 AF of water per year, as

20   estimated by the State Board.

21       36.    However, the Bureau and COMB have been capturing all of the natural

22   watershed runoff and flow of Lauro Creek above the Lauro Dam, thereby

23   eliminating the natural flow of water running through Lauro Creek past the

24   Buynaks' Property.  In 2020, for example, the Bureau and COMB diverted 46.92

25   AF for storage in the Lauro Reservoir.

26       37.    Furthermore, in addition to the water captured and stored in Lauro

27

28   [1]   Summerland Water District was also a beneficiary under the contract
      arrangement, but was later annexed by and became part of MWD in 1995.

Reservoir, the Bureau and COMB have been diverting additional natural flow away from Lauro Reservoir, Lauro Creek and the Buynaks.  The Bureau and COMB have been routing some of the Lauro Creek flow through the Lauro Reservoir's storm drain and into the reservoir's spillway, where it then flows into a *different* creek, i.e., San Roque Creek, in a different watershed.

38.     On information and belief, COMB diverts runoff from Lauro Creek upstream of Lauro Reservoir each year and causes it to flow through the Lauro Reservoir Debris Basin ("Debris Basin").  Water that flows into the Debris Basin is then routed through the reservoir storm drain into the Lauro Reservoir spillway and discharged to San Roque Creek.

39.     The Bureau is required by its Permits to submit annual reports of its water captures, diversions and uses to the State Board.  The annual reports submitted for years 2018 through 2020 reflect that the Bureau captured 14.17 AF in 2018, 96.85 AF in 2019, and 46.94 AF in 2020.  True and correct copies of these three reports are attached hereto as Exhibits 4, 5, and 6, respectively, and are incorporated herein by reference.  These reports also state that COMB diverts runoff from Lauro Creek upstream of Lauro Reservoir each year, and drains that water into the Debris Basin.  The annual reports stated for the first time in 2018 that water that flows into the Debris Basin is routed through the Lauro Reservoir storm drain into the Lauro Reservoir spillway and discharged into San Roque Creek.  In addition, these reports identified for the first time the volume of the Bureau's discharges to San Roque Creek: 8.57 AF in 2018; 96.85 in 2019; and 28.38 in 2020.

40.     San Roque Creek is a separate and distinct water course from Lauro Creek.  The Buynak Property is not contiguous to San Roque Creek, and it is not accessible to the Buynaks' farm.  Accordingly, by interfering with the natural flow of water in Lauro Creek by shifting that water into San Roque Creek, the Bureau and COMB are unlawfully preventing the Buynaks from exercising their vested riparian rights.  As the owner of an appropriative right to divert water from Lauro

Creek that is junior to the Buynaks' riparian right, the Bureau – and anyone acting pursuant to the Bureau's Permits, including COMB – may capture and divert water only if the Buynaks' present and/or future reasonable needs are met.  That is not the case.  The natural flow in Lauro Creek downstream of Lauro Dam cannot meet the Buynaks' needs because the Bureau and COMB have been capturing and either storing Lauro Creek water in Lauro Reservoir or discharging it into San Roque Creek  above the Dam.

41.     Furthermore, groundwater recharge or groundwater storage is not a permitted use under the Bureau's Permits, and while Defendant City is an intended beneficiary of the Bureau's appropriative water rights, as a beneficiary of junior rights, its rights are also junior to the vested senior Buynak riparian rights.

42.     Accordingly, the Buynaks' riparian rights are being infringed by upstream nonriparian use, which violates California law and the Permits.

**The Buynaks' Pre-Litigation Efforts to Informally Resolve This Dispute**

43.     In October 2021, the Buynaks sent a letter to Janet L. Gingras, COMB's General Manager, notifying her of the Buynaks' plans to begin accessing Lauro Creek water for the beneficial use of irrigating their expanding farm.  In January 2022, COMB responded, through its counsel, and disavowed the Buynaks' senior riparian rights.  In the letter, COMB erroneously contended that the Buynaks were too late to assert their riparian rights.

44.     Contrary to the assertions in COMB's response, and as noted above, riparian rights are not somehow "lost" through lack of use.  Such rights remain vested and able to be exercised whenever the rights holder's needs change, such that he/she can put the water to reasonable and beneficial use.  In fact, riparian rights only support concurrent diversions and beneficial uses.  Until the need arises, the rights should not be exercised.

45.     The Buynaks are entitled to all of the natural flow that they can put to a reasonable beneficial use on the Property and are further entitled to be protected in

1   that right by an injunction.  However, riparian owners like the Buynaks are only

2   entitled to an injunction to control the use of water by upstream junior appropriators

3   like the Bureau when the junior appropriator causes injury to the riparian right

4   holder.  The Bureau and COMB's diversion of Lauro Creek water only became

5   injurious – and therefore unlawful – when the Buynaks' need for Lauro Creek flow

6   recently arose.  Until that time, the Buynaks did not have a ripe claim.  October

7   2021 is the earliest date upon which the Buynaks first sought to use the natural flow

8   of water in Lauro Creek.

9        46.    In April 2022, the Buynaks also sent a letter to Michael Jackson, the

10   Bureau's Area Office Manager for the South-Central California Area, notifying the

11   Bureau of the Buynaks' riparian water rights and needs and the Bureau's

12   interference.  The Bureau never responded.

13        47.    The diversion of water from Lauro Creek pursuant to the Cachuma

14   Project is unlawful and in violation of the Buynaks' water rights.  The Bureau and

15   COMB could resolve this matter by taking the relatively simple and straightforward

16   action of releasing water into Lauro Creek in an amount sufficient to meet the

17   Buynaks' recently-increased needs.  Instead of taking such action, COMB refused

18   the Buynaks' request, and the Bureau simply ignored it, thereby leaving the

19   Buynaks no choice but to seek judicial intervention.

20                        **FIRST CLAIM FOR RELIEF**

21   **(Violation of The Reclamation Act of 1902, 43 U.S.C. § 383 against the Bureau)**

22        48.    The Buynaks reallege each and every paragraph of this Complaint as if

23   fully set forth herein.

24        49.    Federal reclamation law requires the Bureau to operate the Cachuma

25   Project in conformity with state water law.  43 U.S.C. § 383.  That statute provides

26   "for the protection of vested water rights" and "requires the Secretary [of The

27   Interior] to comply with state law in the 'control, appropriation, use, or distribution

28   of water.'"  *California v. United States*, 438 U.S. 645, 675 (1978) (quoting the

statute). Defendants have violated California water law, thereby violating 43 U.S.C. § 383.

50.     The Buynaks own riparian land on Lauro Creek and, by virtue of their land ownership, hold vested, riparian rights to put Lauro Creek's natural flow to reasonable and beneficial use. As more fully alleged above, under California law, the Buynaks' riparian rights are senior to the appropriative rights granted to the Bureau – a principle reflected in the State Board's order granting the Bureau's Permits and the Permits themselves, which explicitly render the Bureau's appropriative water rights "subject to" all vested rights, which includes the Buynaks' riparian rights.

51.     The Buynaks plan to exercise their vested, senior riparian rights to meet their current needs of 10 to 12 AF per year, as well as their immediate future needs (i.e., after expanding their farm on the Property, which process is underway) of 25 AF per year of Lauro Creek's natural flow for the irrigation of crops.

52.     Lauro Creek's natural flow is approximately 73 AF per year, as estimated by the State Board. However, as a result of the above-referenced diversion of water from Lauro Creek's natural flow for either storage or subsequent discharge into San Roque Creek to benefit the Districts, that natural flow has been eliminated below Lauro Dam such that no water flows past the Buynaks' Property.

53.     This capture and diversion of water by the Bureau and COMB, violates the Buynaks' riparian rights because California water law prohibits the Bureau – or anyone acting on its behalf, including COMB – from appropriating any water from Lauro Creek unless the Buynaks' reasonable and beneficial needs are first met, including their prospective needs. The Buynaks' riparian rights allow them to access the normal, unimpaired flow of Lauro Creek for their reasonable and beneficial use. Both California law and the Permits obligate the Bureau and COMB to exercise the Bureau's junior appropriative rights without violating the Buynaks' senior rights. The Bureau is not complying with that obligation. As a result of

1    violating California law, the Bureau is violating Reclamation law.

2          54.    Further, under California law, a water right permit "gives the right to

3    take and use water only to the extent and for the purpose allowed in the permit."

4    Cal. Wat. Code § 1381.  The Bureau's Permits do not allow it to redirect Lauro

5    Creek's natural flow into San Roque Creek, as they have been doing.  The Permits

6    also do not identify San Roque Creek as an authorized place of use.  The Permits

7    also do not identify groundwater recharge or groundwater storage as a purpose of

8    use.

9          55.    There is no adequate legal remedy for the foregoing unlawful conduct.

10   If Defendants are not enjoined from engaging in their unlawful diversions, the

11   Buynaks will suffer immediate, irreparable, and grave injury to their Property

12   because they will not have sufficient water to irrigate their farm or use at their

13   residences.

## SECOND CLAIM FOR RELIEF

### (Infringement of Riparian Water Rights by the Bureau and COMB)

16         56.    The Buynaks reallege each and every paragraph of this Complaint as if

17   fully set forth herein.

18         57.    As more fully detailed above, the Buynaks hold riparian rights under

19   California water law to put Lauro Creek's natural and unimpaired flow to reasonable

20   and beneficial use on the Property – rights that are senior to the Bureau's

21   appropriative rights.

22         58.    The operation of Lauro Reservoir by COMB as delegated by the

23   Bureau has impaired – and continues to impair – the natural flow of Lauro Creek by

24   (1) appropriating its water for storage in Lauro Reservoir and (2) redirecting water

25   into San Roque Creek.  Such actions have essentially eliminated the natural flow of

26   Lauro Creek past the Buynaks' Property such that the Buynaks are unable to meet

27   their reasonable and beneficial needs.

28         59.    There is no adequate legal remedy for the foregoing unlawful conduct.

If Defendants are not enjoined from engaging in their unlawful diversions, the Buynaks will suffer immediate, irreparable, and grave injury to their Property because they will not have sufficient water to irrigate their farm or use at their residences.

**THIRD CLAIM FOR RELIEF**

**(Declaratory Judgment re: Plaintiffs' Riparian Rights Against All Defendants)**

60.    The Buynaks reallege each and every paragraph of this Complaint as if fully set forth herein.

61.    A dispute has arisen regarding whether the capture and diversion of Lauro Creek water violates the Buynaks' riparian rights.  The Buynaks contend that their riparian rights entitle them to access the natural flow of Lauro Creek for their reasonable and beneficial use on the Property and that said access may not be impaired or prevented by the damming and diversion of Lauro Creek water upstream by the Bureau as a junior appropriative right holder.  The Buynaks are informed and believe that all Defendants disagree and instead believe that said damming and diversion is entirely lawful.

62.    This dispute presents an actual, present, and justiciable controversy.  A judicial determination of this controversy in the form of declaratory relief is necessary and appropriate for the parties to ascertain their respective rights and obligations regarding this dispute.

**FOURTH CLAIM FOR RELIEF**

**(Declaratory Judgment re: Redirection of Lauro Creek Water Into San Roque Creek Against All Defendants)**

63.    The Buynaks reallege each and every paragraph of this Complaint as if fully set forth herein.

64.    A dispute has arisen regarding what actions are authorized by the Permits.  The Buynaks contend that the Permits do not allow the Bureau – or any other party acting pursuant to the Bureau's Permits or benefited by the Bureau's

1  Permits – to redirect Lauro Creek's natural flow into San Roque Creek because the
2  Permits do not identify San Roque Creek as an authorized place of use.  The
3  Buynaks are informed and believe that Defendants disagree and instead believe that
4  said redirection of water does not violate the Permits.

5      65.    This dispute presents an actual, present, and justiciable controversy.  A
6  judicial determination of this controversy in the form of declaratory relief is
7  necessary and appropriate for the parties to ascertain their respective rights and
8  obligations regarding this dispute.

9                     **FIFTH CLAIM FOR RELIEF**

10  **(Declaratory Judgment re: Use of Lauro Creek Water For Groundwater**
11          **Recharge or Groundwater Storage Against All Defendants)**

12      66.    The Buynaks reallege each and every paragraph of this Complaint as if
13  fully set forth herein.

14      67.    A dispute has arisen regarding what actions are authorized by the
15  Permits.  The Buynaks contend that the Permits do not authorize the "use" of Lauro
16  Creek water by the Bureau – or any other party acting pursuant to the Bureau's
17  Permits or benefitted by the Bureau's permits – for groundwater recharge.  The
18  Buynaks also contend that the Permits limit storage to Lauro Reservoir, not storage
19  in a groundwater basin.  The Permits state that Lauro Creek water in Lauro
20  Reservoir may be used for domestic, irrigation, municipal, and industrial uses and to
21  provide standby storage for Defendants GWD and the City and emergency water
22  supplies for Defendants MWD and CVWD.  The Buynaks are informed and believe
23  that Defendants disagree and instead believe that said recharge or storage does not
24  violate the Permits.

25      68.    This dispute presents an actual, present, and justiciable controversy.  A
26  judicial determination of this controversy in the form of declaratory relief is
27  necessary and appropriate for the parties to ascertain their respective rights and
28  obligations regarding this dispute.

# **PRAYER FOR RELIEF**

WHEREFORE, the Buynaks pray for judgment as follows:

1.      For preliminary and permanent injunctive relief enjoining Defendants from diverting any amount of water from Lauro Creek unless and until the natural flow of Lauro Creek that passes the Buynaks' Property is equal to the amount the Buynaks reasonably need to put to beneficial use, currently estimated at 25 AF per year, or, in the alternative, providing replacement water to the Buynaks in the same amount and quality if water from Lauro Creek cannot be released from Lauro Reservoir to the Buynaks' Property;

2.      For preliminary and permanent injunctive relief enjoining Defendants from redirecting any amount of Lauro Creek's natural flow into San Roque Creek;

3.      For permanent injunctive relief requiring Defendants to install a monitoring device in Lauro Creek adjacent to the Buynaks' Property for the purpose of measuring the flow of water past the Buynaks' Property;

4.      For permanent injunctive relief requiring Defendants to release additional water beyond 25 AF per year upon any future request of the Buynaks (or any successors in interest to the Property and its riparian rights), so long as (i) said request is made on or before January 1 of the year in which the additional water is to be provided, and (ii) Defendants (or any of them) do not provide the Buynaks with a written objection within 30 days of the request stating the reasons for Defendants' refusal;

5.      For permanent injunctive relief requiring COMB (or any successor operator of the Cachuma Project) to provide the Buynaks (or any successors in interest to the Property and its riparian rights) with regular weekly, monthly, and yearly reports regarding the release of Lauro Creek water;

6.      For a declaratory judgment, pursuant to the Third Claim for Relief, declaring that Defendants may not cause the natural flow of water through Lauro Creek and running past the Buynaks' Property to be anything less than 25 AF per

year because doing so violates the Buynaks' riparian water rights and thereby violates the Permits and 43 U.S.C. § 383, and for ancillary injunctive relief to enforce said declaration;

7.      For a declaratory judgment, pursuant to the Fourth Claim for Relief, declaring that the Permits do not allow the Bureau – or any other party acting pursuant to the Bureau's Permits – to redirect any amount of Lauro Creek's natural flow into San Roque Creek, and for ancillary injunctive relief to enforce said declaration;

8.      For a declaratory judgment, pursuant to the Fifth Claim for Relief, declaring that the Permits do not authorize the "use" of Lauro Creek water by the Bureau – or any other party acting pursuant to the Bureau's Permits – for the purpose of groundwater recharge or storage and for ancillary injunctive relief to enforce said declaration;

9.      For costs of suit incurred herein, including attorneys' fees; and

10.     For such other and further relief as the Court may deem just and proper.

Dated:  October 5, 2022

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP

By: _/s/ David L. Osias_
DAVID L. OSIAS
ALEXANDER J. DOHERTY
TARA E. PAUL
Attorneys for Plaintiffs
Stephen Timothy Buynak, Jr. and
Gloria Ann Buynak, Trustees of The
Buynak 1991 Family Revocable Trust

# Exhibit 1

# STATE OF CALIFORNIA
# STATE WATER RIGHTS BOARD

\*\*\*

| | | |
|---|---|---|
| In the Matter of Applications 11331, 11332, 11761, 11762 and 11989 by the United States of America, Department of the Interior, Bureau of Reclamation | ) ) ) ) ) ) ) | Sources:  Santa Ynez River<br>             Lauro Creek<br>             West Fork Glen<br>             Anne Creek<br><br>County:  Santa Barbara |

---

Decision No. D 886

Decided:  February 28, 1958

\*\*\*

Appearances at Hearing Conducted at Santa Barbara on July 16, 17, and 18, and at Sacramento on September 5, 1957, by Henry Holsinger, Chairman, John B. Evans, Member, and W. P. Rowe, Member, State Water Rights Board:

For the Applicant:

United States of America

John K. Bennett, Assistant Regional Solicitor, Department of the Interior

For the Protestants:

City of Lompoc

Carl B. Kappler, Attorney

Miss Ynez de la Cuesta  )
Mrs. Dulce de la C. Jensen )
Henry G. Bodkin  )

Henry G. Bodkin, Attorney

For Interested Parties:

Santa Barbara County Water Agency

Francis Price, Attorney

Santa Ynez River Water Conservation
   District

Arden T. Jensen, Attorney

U. S. Corps of Engineers

Clyde L. Walker, Chief Legal Branch, U. S. Corps of Engineers South Pacific Division

DECISION

## Substance of the Applications

The United States of America through its Bureau of Reclamation, Regional Office, Region 2, Sacramento, filed Applications 11331, 11332, 11761, 11762 and 11989 in support of the Cachuma Project in Santa Barbara County, California, as follows:

Application 11331, filed on March 25, 1946, is for a permit to appropriate 100 cubic feet per second from Santa Ynez River by direct diversion year-round and 275,000 acre-feet per annum by storage to be collected between October 1 of each year and June 30 of the following year.  Direct diversion and storage are to be effected by Cachuma Dam located within the NW$\frac{1}{4}$ of SW$\frac{1}{4}$ of projected Section 19, T6N, R29W, SBB&M*.  Water is to be used for domestic, salinity control and incidental recreational purposes and for irrigation of 61,000 acres net within a gross area of 175,000 acres along the south coastal area of Santa Barbara County within T4 to 8N, R25 to 36W, both inclusive.

Application 11332, filed March 25, 1946, is for a permit to appropriate 50 cubic feet per second from Santa Ynez River by direct diversion year-round and 275,000 acre-feet per annum by storage to be collected between October 1 of each year and June 30 of the following year.  Direct diversion and storage under this application will likewise be effected by Cachuma Dam and the water

*Hereinafter all reference to section, township and range are from San Bernardino Base and Meridian (SBB&M).

-2-

is to be used for municipal, industrial and incidental recreational purposes within various cities, towns and other municipalities presently in existence or as may be created within the service area heretofore described under Application 11331.  Relative to the amount of water to be appropriated, Application 11332 provides as follows:

> ". . . The figure of 275,000 acre-feet per annum for temporary storage and later application to beneficial use duplicates the 275,000 acre-feet applied for under Application No. 11331 for irrigation and domestic water because the storage will be used for both municipal and irrigation uses in ways which would not permit segregation without increasing the combined amount of storage applied for."

Application 11761, filed on March 7, 1947, is for a permit to appropriate 15 cubic feet per second from Lauro Creek (also called Diablo Creek) by direct diversion year-round and 500 acre-feet per annum by storage to be collected between October 1 of each year and June 30 of the following year.  Direct diversion and storage will be effected by Lauro Dam located within the NE$\frac{1}{4}$ of SE$\frac{1}{4}$ of Section 5, T4N, R27W.  Water is to be used for domestic purposes and for irrigation of 24,300 acres net within a gross area of 34,500 acres.  The application further provides as follows:

> "Lauro Reservoir is to be used in conjunction with the South Coastal Conduit to provide regulatory and standby storage primarily for the Goleta County Water District and the City of Santa Barbara.  In addition the reservoir will provide, under certain emergency conditions, a source of supply for the Carpinteria Section of the conduit which will serve the Montecito, Carpenteria and Summerland County Water Districts."

Application 11762 is for municipal and industrial purposes, bears the same filing date, and names the same source, amounts to

-3-

be appropriated, seasons of diversion and physical works as set forth under Application 11761.  Application 11762 describes the place of use as being within the cities and towns of Santa Barbara, Summerland, Montecito, Carpinteria and Goleta, and provides as follows:

> "The quantities indicated ... will be the same water applied for under Application 11761 for irrigation and domestic purposes."

Application 11989, filed on July 14, 1947, is for a permit to appropriate 24 cubic feet per second from West Fork Glen Anne Creek by direct diversion year-round and 500 acre-feet per annum by storage to be collected between October 1 of each year and June 30 of the following year.  Direct diversion and storage are to be effected by Glen Anne Dam located within the NE$\frac{1}{4}$ of SE$\frac{1}{4}$ of Section 35, T5N, R29W.  Water is to be used for domestic purposes and for irrigation of 2,570 acres net within a gross area of 5,400 acres comprising a portion of Goleta County Water District.  Application 11989 also provides as follows:

> "Glen Anne Reservoir, with a year-round normal capacity of 500 acre-feet, is to be used in conjunction with the South Coast Conduit to provide regulatory and standby storage for a portion of the Goleta County Water District.  In addition, the reservoir will provide capacity for the conservation of flows which are in excess of the requirements in the South Coastal Conduit downstream from Glen Anne turnout."

<u>Protests</u>

Forty-two protests were filed against Applications 11331 and 11332 by owners of land in the Santa Ynez Valley and by the

-4-

City of Lompoc.  None of the protestants entered an appearance at
the hearing except the City of Lompoc and those represented by
Henry G. Bodkin.  The latter withdrew their protest (R.T. page 15).
No protests are of record against Applications 11761, 11762 and
11989.  Although it is unnecessary for the Board to consider indi-
vidually the protests of those who failed to present evidence at
the hearing in support of their claims, the facts alleged by them
as summarized herein are of a nature to justify consideration by
the Board in the course of performing its obligation to determine
whether the proposed appropriations will best conserve the public
interest (Water Code Sections 1253, 1255, 1257).

All of the protestants use substantially the same language
in opposing Applications 11331 and 11332.  Collectively they claim
ownership of approximately 4,700 acres of land in Santa Ynez Valley
suitable for irrigation, that approximately 4,100 acres have been
irrigated for more than five years last past which are dependent
upon the surface flow and underflow of Santa Ynez River, that use
of water is being carried on under riparian right, overlying right
and/or by appropriation, that the land not presently under cultiva-
tion will necessitate an additional quantity of water at such time
in the future as development is extended and that the present and
and future needs of the Valley require that all of the natural flow
produced in the watershed be undiminished in quantity except during
the short and occasional periods of flash floods.

In addition to irrigation requirements the protestants
point out that in Santa Ynez Valley there are located a city, towns,
and rural communities which for many years have been wholly dependent

-5-

upon the waters produced by the Santa Ynez River system for domestic purposes.

They allege that the stream flow records of the Santa Ynez River indicate that from 1906 to 1950 flash floods with peak dis- charges exceeding 5,000 cubic feet per second at Lompoc have occurred in only twenty storms.  These storms occurred in January in six years, in February of nine years, in March of three years and in April of two years.

With the natural surface flows that have existed in the Santa Ynez River system over the past years it is claimed that water levels in the underground streams and in the percolating water strata have been dangerously lowered and a high volume of runoff from the headwaters of the river is required to replenish and maintain ground water levels, that all the water in the Santa Ynez River system is required to fill the needs and rights of riparian and overlying owners and holders of other rights and if there is any right to salvage excess waters produced by flash floods the right to these waters should be exercised solely for the benefit of lands to which valid rights to the waters of the Santa Ynez River attach and upon which water the lands are dependent.

The City of Lompoc in its protest against Applications 11331 and 11332 states, in addition to the allegations set forth in the preceding paragraphs, that it owns and maintains the water system which supplies 7,000 inhabitants in the subdivided portion of the City comprising an area of approximately three square miles.  As to its past and present uses of water the City asserts that its

-6-

diversions from the Santa Ynez River Basin have increased from 10,300,000 cubic feet during the year of 1928 to 34,200,000 cubic feet during the year of 1949.

## Answers to Protests

The Bureau of Reclamation, on behalf of the United States, in its answers to the protests asserts that the applications are to appropriate unappropriated water and that the United States recognize and respect valid prior water rights.  In this connection the Bureau advises that the United States has entered into a contract with the Santa Ynez River Water Conservation District (USBR Exh. 28 - herein-after referred to as "Live Stream Agreement") which limits storage in Cachuma Reservoir to only those waters subject to appropriation.  Article 15(a) of the contract provides as follows:

> "(a)  The water from the Santa Ynez River to be conserved, distributed, and used by means of the Cachuma Unit, other than water obtained by means of tunnels in the Santa Ynez Mountain Range, shall be water which, at time of the appro-priation thereof by the United States, was or shall be available for appropriation under laws of the State of California.  All established water rights, whether such rights are presently fully developed or not, are hereby recognized and shall be preserved notwithstanding the execution of this contract or of any provision of this contract to the contrary, or any operation of use here-under."

In addition, the United States recognizes under Article 15(c) of the contract the existing rights and rights for the future development of the Santa Ynez River Valley:

> "(c)  The United States hereby recognizes and agrees not to take, restrict, impair, or interfere with any or all of said presently established rights to water for present use and future development based upon such rights."

-7-

Under Article 11 of the contract the United States is limited to the period of time during which water may be impounded in Cachuma Dam:

> "11.  At times when a live stream as hereinabove defined, is not in existence, the United States shall not store or divert any part of the water then flowing into Cachuma Reservoir that would be required to maintain a live stream as hereinabove defined, or that would be conducive toward maintaining a live stream ..."

Article 10 of the contract defines the live stream referred to in Article 11:

> "10.  A live stream ... shall be deemed to exist in the Santa Ynez River whenever there is a visible stream of water flowing on the surface of the river at San Lucas Bridge, at the Mission Bridge near Solvang, at the U.S. Highway 101 Bridge near Buellton, at what is known as Santa Rosa damsite ... at Robinson's Bridge near Lompoc, and there is sufficient flow in the river of not less than one cubic foot of water per second at the H Street Bridge, which is north of Lompoc."

The Bureau alleges that under Article 15(e) of the contract the Santa Ynez River Water Conservation District which encompasses the major portion of the Santa Ynez River watershed downstream from Cachuma Dam and substantially all of the Valley floor area expressly recognizes Applications 11331 and 11332 on behalf of itself and the landowners within the District.  Article 15(e) provides:

> "(e)  The District on its own behalf and on behalf of those for whom this contract is made recognizes the rights of the United States, particularly those under Applications No. 11331, 11332 ... filed with the Division of Water Resources (now the State Water Rights Board) of the State of California for the appropriation, storage and diversion of unappropriated water in accordance with the laws of the State of California."

The Bureau indicates that the releases of water from Cachuma Dam under the contract are intended to be sufficient to satisfy existing rights and replenish underground storage, that increased ground

-8-

water use will require increased releases in order to maintain the live stream and therefore the Bureau believes that the requirement for maintaining a live stream in the Santa Ynez River will assure water enough for future as well as present uses in the Valley.

## Hearing Held in Accordance with the Water Code

Applications 11331, 11332, 11761, 11762, and 11989 were completed in accordance with the Water Code and applicable administrative rules and regulations and were set for public hearing under the provisions of the California Administrative Code, Title 23, Waters, before the State Water Rights Board (hereinafter referred to as "the Board"), on Tuesday, July 16, 1957, at 10 a.m. in the Courthouse at Santa Barbara.  Of the hearing the applicant and the protestants were duly notified.  The hearing extended through later sessions convened on July 17 and 18, 1957, in Santa Barbara and on September 5, 1957, at the Board's office in Sacramento.  The following discussion and analysis is based on evidence received at said hearing.

## Description of the Watershed

### Santa Ynez River

The Santa Ynez River traverses the entire width of the southern part of Santa Barbara County, following a course slightly north of west for about 70 miles from Juncal Canyon, just inside Ventura County, to the Pacific Ocean, near the town of Surf.  The river has a drainage area of about 15 miles in maximum width and a total of some 900 square miles.  The southern border of the watershed

is the crest of the narrow Santa Ynez Mountains.  Its northern border
is the San Rafael Mountains to the east, the lower Purisima Hills to
the west.

Cachuma Dam is located about 45.7 miles from the mouth of
the Santa Ynez River and commands a drainage area of approximately
421 square miles.  Above Cachuma Dam the Santa Ynez River receives
several large tributaries from the north such as Mono, Santa Cruz,
and Cachuma Creeks, which drain the south slopes of the rugged San
Rafael Mountains.  Many smaller tributaries from the south drain the
north slopes of the Santa Ynez Mountains.

Two dams currently impound water in the headwater region
of the Santa Ynez River, forming Jameson Lake and Gibraltar Reservoir,
which supply water by transmountain tunnel diversions to the Montecito
County Water District and the City of Santa Barbara, respectively.

Mean annual precipitation within the drainage basins varies
from 14 inches on the coast and 18 inches near Cachuma Dam, to as
much as 40 inches at the eastern boundary of the river basin.  Of
the total volume of precipitation on all the river basin, about two-
thirds falls on the area upstream from Cachuma Dam.  The climate of
the area is typical Mediterranean-type with wet winters, during which
about 85 per cent of the total annual precipitation occurs, followed
by dry summers (SWRB Exh. 10).

Glen Anne Creek

Glen Anne Creek heads near the crest on the south side of
the Santa Ynez Mountains and flows southerly for about six miles
to the Pacific Ocean.  Glen Anne Dam on West Fork Glen Anne Creek is

located about five miles from the mouth of Glen Anne Creek and commands a drainage area of 0.56 square miles.  The elevation of the drainage area varies from about 2,100 feet in the headwaters to sea level near the mouth.

Mean annual precipitation at San Marcus Pass at elevation 2250 which is located a few miles to the east, was 29.7 inches for the periods 1897 to 1916 and 1921 to 1955.  The mean annual precipitation near sea level for the area was 18.4 inches, measured at Santa Barbara, elevation 130, for the years 1867 to 1955.  The climate is typical of Santa Barbara County with wet winters followed by dry summers (USBR Exh. 10).

Lauro Creek

Lauro Creek, also called Diablo Creek, is a short intermittent stream about two miles long.  Its headwaters are in a small canyon on the south flank of the Santa Ynez Mountains at an elevation of about 1,000 feet.  The stream flows southwesterly for about two miles where it debouches onto the Santa Barbara Plain near San Rogue School. Lauro Dam is located about 3/4 mile above San Rogue School and receives the runoff of a drainage area of 0.43 square mile.

Mean annual precipitation at station "Pinecrest" near the south portal of Santa Barbara tunnel and immediately above Lauro Dam, as measured by a gage located at elevation 1,000 feet during the period 1897 to 1916 and at elevation 1,200 feet during the period 1929 to 1955, was 24.2 inches (USBR Exh. 10).

<div align="center">The Cachuma Project</div>

The Cachuma Project was authorized by House Document 587,

<div align="center">-11-</div>

80th Congress, 2nd Session (SWRB Exh. 9), and was designed to conserve the runoff of flood waters of Santa Ynez River.  The principal features of the project are the Cachuma Dam and Reservoir on Santa Ynez River, Tecolote Tunnel to convey the water from the Reservoir through the Santa Ynez Mountains to the coastal area of Santa Barbara County, and the South Coast Conduit to distribute water to several county water districts and the City of Santa Barbara in the coastal area.  Included in the main conduit system are three small regulating reservoirs (Glen Anne, Lauro and Ortega), located along the conduit and a terminal reservoir (Carpinteria) (R. T. page 110).

Cachuma Dam is located on the Santa Ynez River about 25 road miles northwest of the City of Santa Barbara, by State Sign Route 150. The dam is an earth and rock filled structure rising 206 feet above streambed and having a crest length of 2,975 feet.  The spillway section is concrete lined with four 50 by 30 foot radial gates having a capacity of 161,000 cubic feet per second.  A controlled outlet pipe 38 inches in diameter permits reservoir releases to water users downstream from the dam.  The reservoir formed by Cachuma Dam has a gross capacity of about 205,000 acre-feet with 32,500 acre-feet of inactive storage below the Tecolote Tunnel intake and 172,500 acre-feet of active storage space above the tunnel intake for diversion to the south coast area.  Construction of Cachuma Dam was completed on July 17, 1953 (R.T. page 110).

Tecolote Tunnel extends through the mountains from Cachuma Reservoir to the headworks of the South Coast Conduit on the coastal side of the Santa Ynez range.  A total flow of more than 7 cubic feet per second of seepage water was encountered during construction,

-12-

causing considerable delay in completion of the bore.  The tunnel is concrete lined, seven feet in diameter and 6.14 miles long with perforations to collect seepage, and has a capacity of 1,000 cubic feet per second (R. T. page 111).  Construction of the tunnel was completed January 28, 1956 (R.T. page 113).

The South Coast Conduit consists of a high pressure reinforced concrete pipeline extending 26 miles eastward from the outlet portal of Tecolote Tunnel across canyons, hills and highly developed residential areas to the Carpinteria Regulatory Reservoir located about two miles northeast of the town of Carpinteria.  The conduit is divided into two sections; namely, the Goleta Section and the Carpinteria Section.

The Goleta Section of the conduit consists of 10 miles of 48-inch diameter reinforced concrete pipe.  It begins at the south portal of Tecolote Tunnel and extends to the Lauro Reservoir in Lauro Canyon north of the City of Santa Barbara.  This section of the conduit has a capacity of 70 cubic feet per second and has been in operation since July 3, 1951 (R.T. page 114).

The Carpinteria Section of the conduit connects to the Goleta Section in a control house just before the Goleta Section enters Lauro Reservoir and extends 16 miles eastward to the Carpinteria Reservoir with a capacity of 40 acre-feet, located about two and one-half miles northeast of the town of Carpinteria.  This section of the conduit is composed of 36, 30 and 27-inch diameter concrete pipe and has a capacity varying from 38 cubic feet per second through the 36-inch section to 11.6 cubic feet per second through a portion of the 27-inch section (USBR Exh. 40).  A portion of the

-13-

conduit passes through the 1.1 miles long six-foot diameter Sheffield Tunnel near its terminus.

Glen Anne Dam is an earthfilled structure 102 feet high with a crest length of about 240 feet and is located on the West Fork Glen Anne Creek downstream from the entrance of Goleta Section of the conduit.  The reservoir formed by the dam has a capacity of 500 acre-feet (R.T. page 114) and stores the overflow from the conduit.

Lauro Dam is an earthfilled structure 110 feet high with a crest length of 540 feet.  The reservoir created by the dam has a capacity of 642 acre-feet (R.T. page 114) and is located near the terminus of the Goleta Section of the conduit.

The Ortega Regulatory Reservoir is located about one mile north of the town of Summerland.  This reservoir is a concrete lined basin having a water depth of 18 feet and a capacity of 60 acre-feet.

Lauro, Ortega and Carpinteria Regulating Reservoirs are constructed and connected to the South Coast Conduit so as to "float on the line" with water elevation at the hydraulic gradient of the conduit.  Automatic pressure valves control the reservoirs' storage to supply additional water during periods of peak demand (R.T. page 115).

The total cost of the Cachuma Project has amounted to $43,360,000 of which $14,000,000 has been expended for the Cachuma Dam and Reservoir, $14,550,000 for Tecolote Tunnel, $6,410,000 for the South Coast Conduit and the remainder for the regulatory reservoirs, distribution systems and general property (R.T. page 116).

The estimated total annual project yield based upon reservoir operation studies with runoff of Santa Ynez River as actually

-14-

occurred from 1918 through 1952 is 33,200 acre-feet including an esti-
mater yield of 1,400 acre-feet per annum from seepage into Tecolote
Tunnel (USBR Exh. 42).

## Stream Flow

### Santa Ynez River

The Santa Ynez River is an intermittent stream with very
wide seasonal and annual variations in flow.  In most years low summer
flows are all diverted for beneficial use, or are absorbed in the al-
luvium of the river bed as ground water recharge.

Runoff of "Santa Ynez River at Robinson Bridge" (immediately
east of the town of Lompoc and about 13 miles upstream from the ocean)
has been measured by the United States Geological Survey since 1906.
This gaging station which is below 88 per cent of the watershed has,
for the 42 years of published record, 1906 through 1954, measured an
average annual discharge of 135,824 acre-feet with a maximum annual dis
charge of 652,330 acre-feet in water year 1940-41 to zero flow in water
year 1950=51 (USBR Exh. 16).

Studies by the United States Geological Survey have shown
that a relatively small amount of the surface flow of Santa Ynez River
below Robinson Bridge contributes to the ground water basin underlying
Lompoc plains.  Therefore the flow at this gage, particularly during
the periods of high discharge, is an indication of the quantities which
have wasted to the ocean (SWRB Exh. 10).

-15-

Runoff of "Santa Ynez River at San Lucas Bridge" (about three miles downstream from Cachuma Dam) was measured by the City of Santa Barbara from 1928 to 1934 and since that time by the United States Geological Survey.  The measured runoff at this gaging station for the 24 years of published record prior to construction of Cachuma Dam, October 1928 through September 1952, has averaged 71,730 acre-feet annually with a maximum annual discharge of 475,098 acre-feet in water year 1940-41 and one acre-foot or less in water years 1930-31, 1947-48 and 1950-51 (USBR Exh. 17).  The maximum discharge during the period of record was 43,700 cubic feet per second on March 2, 1938 (R.T. page 49).  By correlation with the record of flow at a gaging station at Gibraltar Dam, which has the longest record of any station on the river, it has been determined that the average annual natural flow at Cachuma Dam for the 47 years 1905-1952 is 95,500 acre-feet.  Average annual upstream depletions by Jameson Lake and Gibraltar Reservoir have amounted to a total of 5,766 acre-feet (USBR Exh. 18).

Lauro Creek and West Fork Glen Anne Creek

Lauro Creek and West Fork Glen Anne Creek are intermittent streams with a drainage area of 0.43 square mile and 0.56 square mile, respectively, above Lauro Dam and Glen Anne Dam.  There have been no gaging stations located on these streams but a station has been operated since 1941 on San Jose Creek.  This station is located

-16-

about 1.7 miles north of the town of Goleta and has a drainage area
of 5.54 square miles.  Runoff data in acre-feet by months for the
period of record are contained in USBR Exh. 19.  The drainage area
above the gaging station on San Jose Creek is, according to the
applicant's witness, similar to the drainage area above Lauro Dam
and Glen Anne Dam (R.T. page 58) and by reducing the recorded runoff
of San Jose Creek by the ratio of drainage areas it is estimated that
the mean annual discharge of Lauro Creek and West Fork Glen Anne
Creek at Lauro Dam and Glen Anne Dam is 73 acre-feet and 93 acre-feet,
respectively, with an estimated maximum annual runoff of 275 acre-
feet and 359 acre-feet, respectively, occurring in the water year
1951-52 (USBR Exhs. 20 and 21).

## Geology

The Santa Ynez River Basin has five divisions with respect
to topographic, geologic and hydrologic features.  In downstream
order they are designated (1) Headwater Subarea, (2) Santa Ynez Sub-
area, (3) Buellton Subarea, (4) Santa Rita Subarea, and (5) Lompoc
Subarea.  The following discussion of geology is based upon informa-
tion contained in SWRB Exhibit 10 (Water Supply Paper 1107, U. S.
Geological Survey, "Geology and Water Resources of the Santa Ynez
River Basin, Santa Barbara County, California", dated 1951).

The Headwater Subarea extends from the source of the Santa
Ynez River westward to the San Lucas Bridge.  It is underlain mainly

-17-

by consolidated and essentially nonwater-bearing rocks.  The flow and underflow of the Santa Ynez River is for all practical purposes confined to the shallow channel deposits and thin elongated bodies of alluvium along the river.  In practically all the area the ground water and surface flow probably discharges into the Santa Ynez River.

The Santa Ynez Subarea extends from the San Lucas Bridge downstream to near the town of Solvang.  The water-bearing formations underlie two main areas which are separated by a nearly continuous barrier of impermeable consolidated rocks which is crossed only by Alamo Pintado, Zanja Cuta, and Santa Aquenda Creeks flowing from the north.  The flow and underflow of the Santa Ynez River within this subarea is almost completely enclosed in the shallow aquifers by the consolidated rocks.  There is an effluent flow of an estimated 4,000 acre-feet per year at low water stage, from creeks and springs on the north into the Santa Ynez River.

Just west of Solvang and for a distance of about six miles the Santa Ynez River leaves the consolidated rocks and traverses the Buellton Subarea.  The inner valley is floored by an alluvial plain more than a mile wide, which lies against unconsolidated water-bearing formations on the north and consolidated nonwater-bearing rocks on the south.  In the subarea as a whole the chief water-bearing formations are the relatively shallow river channel deposits and deposits confluent with the water of the river.  There is an effluent flow, estimated to be at least 2,000 acre-feet per year during low water stage, from the water-bearing deposits to the north, into the Santa Ynez River.

-18-

The Santa Rita Subarea's eastern border is located about 2.4 miles west of Buellton where the river crosses over a ridge of consolidated rock.  The river then flows westward through a deep winding broad valley enclosed laterally by impermeable consolidated rocks, with the exception of Salsipuedes Creek drainage basin on the south, to the gap known as the Narrows.  Along the Santa Ynez River, ground water occurs in the deposits in and lying along the river, and the static level is in large part determined by the river stage. The ground water south of the Santa Rita Hills is confluent with the water of the Santa Ynez River, however, indications are that the chief source of water under present conditions is unmeasured miscellaneous inflow from the sides.  There is an estimated effluent flow to the river across the subarea of about 725 acre-feet per year during low water stage.

The Lompoc Subarea comprises the river reach between the Narrows and the ocean, and includes the tributary valleys.  The Lompoc Plain, hilly uplands to the north, and the trough between the Purisima Hills and the Santa Rita Hills are underlain by unconsolidated deposits that contain and transmit ground water with varying facility.  In order of depth the water-bearing formations are the lower member of the younger alluvium, the gravelly terrace deposits, the Orcutt sand, the Paso Robles sands, silts and clays, and Cureaga sand.

The main water-bearing zone, the lower member of the younger alluvium and the secondary water-bearing zone, the terrace deposits, sustain nearly all the artificial draft and appear to act as huge gravel-enveloped wells through which water is withdrawn from underlying and more extensive finer grained material.  The specific and more

-19-

immediate sources of recharge in order of relative volume of contri-
bution are, according to SWRB Exhibit 10, (a) the Orcutt, Paso Robles
and Careaga formations by transmission underground from the margins
of the plain and from below; (b) the shallow water-bearing zone,
partly by continual transmission of water to the main and secondary
zones from the tributary streams, and partly by seasonal unwatering
as a result of pumping from the main and secondary zones; (c) the
Santa Ynez River by seepage loss in the first 3,000 feet below Robin-
son Bridge, near the Narrows, and in a small part in Sections 23 and
24, T7N, R35W; and (d) by movement of underflow through the tongue
of the main water-bearing zone that extends upstream through the
Narrows.

<div align="center">

Water Quality

</div>

The following discussion of water quality is based upon
information contained in SWRB Exhibit 11 (U. S. Department of the
Interior, Bureau of Reclamation, "Santa Ynez River Basin, California,
A Reconnaissance Study of Water Problems of Southern Santa Barbara
County", dated 1955) and SWRB Exhibit 13 (U. S. Department of the
Interior, Geological Survey, Ground Water Branch, "Ground Water
Appraisal of the Santa Ynez Basin, Santa Barbara County, California,
1945-52", dated 1957).

Surface water from the San Rafael and Santa Ynez Mountains
generally is a carbonate type of good quality with low to moderate
total salinity, low per cent sodium, and low boron and chlorides.
Limited analyses of water from Gibraltar Reservoir, Cachuma Reservoir

<div align="center">

-20-

</div>

and the Santa Ynez River at Buellton show this water to be Class 1 irrigation quality. For municipal use it would be rated very hard and high in sulphates. No alternate source is available, however, and this water has been used satisfactorily for domestic purposes for many years.

Ground water quality analyses have been made principally from the deep water body on the Lompoc plain. Chemical constituents generally are evenly balanced, and the total salinity is moderate. Analyses indicate that chloride concentrations of more than 300 parts per million are exceptional. The variations appear to be governed in a large part by the different formations that contain the deep water in different parts of the area. The chloride concentration ranges from about 80 parts per million in the eastern part of the Lompoc area to about 160 parts per million in the western part. This rather wide range probably is a result of the varied quality of water from the different underlying formation and perhaps of downward percolation locally of shallow water of high salt concentration. No evidence of sea-water intrusion has been found.

The range in hardness of the deep water generally is comparable to the range in Chloride content. Analyses since 1935 indicate that the ground water of the Lompoc plain has ranged between the limits "good" to "permissible" and "doubtful" to "unsuitable". No single analysis indicated a water wholly unsuitable for irrigation. The boron concentration in general is low. The only crop grown on the Lompoc plain that is sensitive to boron is walnuts, and therefore for all other crops the waters may be classified as "excellent" to "good" so far as boron is concerned.

<div align="center">-21-</div>

## Downstream Rights

It is not disputed that the natural flow of the Santa Ynez River supplies surface diversions for beneficial use on adjacent lands and contributes to ground water by percolation from the channel in the reach of the stream below Cachuma Dam, which ground water is drawn upon for beneficial use on overlying lands.  Estimates of the amount of such contribution have been made as the results of studies conducted by the United States Geological Survey (SWRB Exh. 12).  In order to afford protection to these rights the United States through the Bureau of Reclamation entered into the "Live Stream Contract" dated October 7, 1949, with the Santa Ynez River Water Conservation District (USBR Exh. 28), heretofore discussed under "Answers to Protests".  The contract was modified with the consent of the Santa Ynez River Water Conservation District June 5, 1956, "to provide for temporary retention of water in Cachuma Reservoir and subsequent release for experimental purposes" (USBR Exh. 29).

The United States has announced its intention of releasing sufficient water past Cachuma Dam to maintain the ground water basins and satisfy prior rights.  Allowance of approximately 1,400 acre-feet per year for these purposes has been made in project planning by the Bureau but it is recognized that should a greater need become evident at some future time such deficiencies can be made up by greater re-leases from the Cachuma Dam or by additional storage projects (R.T. page 132).  There is general agreement however that computations of the amount and timing of the required releases for satisfaction of downstream rights are extremely complex and that available

-22-

information is insufficient upon which to base positive conclusions.
In recognition of these uncertainties, the Bureau, through its princi-
pal witness, Leland Hill, and in the "Live Stream Agreement" recom-
mends a trial period of at least 10 years during which intensive
studies would be made of the hydrologic phenomena associated with
this problem (R.T. Vol. II, pages 274 to 277).

Harold Conkling, civil engineer and principal witness for
Santa Ynez River Water Conservation District, upon the basis of his
studies made in cooperation with the United States Geological Survey
and Bureau of Reclamation (R.T. Vol. II, page 301), concurs with
the Bureau's witness that there are a considerable number of unknown
or undetermined factors which will have to be more closely investi-
gated before any final conclusions can be reached, and indicates
that it would be essential to have the Board retain jurisdiction over
any permit issued to the Bureau in connection with the Cachuma Pro-
ject (R.T. Vol. II, page 307).  The District has submitted recommen-
dations for permit terms including provision for a trial period
throughout the entire life of the permits for evaluation of the
effect of the project upon downstream rights, during which period
studies, investigations and measurements would be made by the United
States and reported annually to the Board.

There is ample support for permit terms to carry into
effect the foregoing recommendations*  There is lacking in the record
of these proceedings sufficient information upon which to base

*The live stream contract is but a starting point in the determina-
tion of how much water is required to be released for the protection
of vested rights, without resulting in unnecessary waste into the
ocean.

-23-

positive and definite conclusions concerning conditions to be imposed
at this time in permits issued to the United States for the adequate
protection of downstream vested rights and the indicated investiga-
tion and studies should be carried out and reported annually by the
United States until further order.  The Board should retain juris-
diction for the purpose of such reviews, hearings, and orders as
may be required until a final determination and order can be made
concerning the amounts, timing and rates of releases of water past
Cachuma Dam in satisfaction of existing downstream rights, based upon
further future information to be developed by the continuing studies
and investigations.

   Considerable evidence is in the record as to the present
and anticipated future water requirements from the ground water basin
underlying Santa Ynez Valley, principally on behalf of the City of
Lompoc and of the United States military reservation, Camp Cooke.
Such evidence need not be given detailed consideration in this de-
cision since to do so would not affect the conclusions reached.
Suffice it to say that the underground water of the valley which is
unquestionably supplied principally from Santa Ynez River is the
only source of supply of numerous users under valid rights and main-
tenance of this water source is of utmost importance.

### Fish and Wildlife

  A trout fishery is in operation on Cachuma Reservoir.  Al-
though trout appear to thrive in Cachuma Reservoir, the fishery must
be maintained artificially as there is no natural spawning area.

The Santa Ynez River above the reservoir contains limited amounts of gravel for spawning of trout, but upstream diversions so reduce flows during the spawning season that the river is practically nonproductive of game fish (SWRB Exh. 11).  Relative to the matter of fish preservation the former State Division of Water Resources made the following recommendation to the Secretary of the Interior pursuant to the proposed Federal report on the Cachuma Project.

> "5.  It is recommended that, because of the limited water supply available ... to meet present and anticipated future domestic, municipal and irrigation requirements ... no water from the Cachuma unit ... be dedicated to the protection or propagation of fish life on that stream." (SWRB Exh. 9).

## The Project Beneficiaries

A contract for transfer of the operation and maintenance of the Cachuma Project to member units of the Santa Barbara County Water Agency was executed by the United States and the Agency on February 24, 1956 (USBR Exh. 46).  Initial operation of the South Coast Conduit began February 29, 1956, and operation and maintenance of the Tecolote Tunnel began on May 15, 1957.  The contract specifies that the Cachuma Dam will not be transferred to the Agency for operation and maintenance prior to November 1, 1962, unless and until new operating criteria are established or the existing operating criteria are renewed or modified by agreement between the United States and the Santa Ynez River Water Conservation District (R.T. page 129).

The Santa Barbara County Water Agency has entered into a contract dated September 12, 1949, with the United States for the furnishing of water from Cachuma Project to member units of the

-25-

Agency (USBR Exh. 44).  The contract became effective upon its execution and is to remain in effect for a period of forty years commencing with the year in which the initial delivery date occurs with an option for extension or renewal should, during the term of contract, Congress enact the necessary legislation.  The contract provides that, to the extent water and necessary facilities are available, the United States will furnish to member units of the Agency each year total quantities amounting to 8,700 acre-feet beginning about 1960 and increasing periodically to 32,000 acre-feet at about 1985.  Studies of the United States have indicated that an additional water supply for the Santa Ynez Valley and the South Coastal Area will be required about 1985 (SWRB Exh. 14).

The County of Santa Barbara has also entered into a contract with the United States for the development, maintenance and administration of the area surrounding Cachuma Reservoir for recreational purposes (SBCWA Exh. 10).  The County has developed a park with extensive recreational facilities at the Tequepis Point area, and plans are being formulated for future development in other areas (R.T. pages 162-164).

Assembly Concurrent Resolution No. 2 of the 1952 1st Extraordinary Session and Senate Concurrent Resolution No. 8 of the 1952 Regular Session of the California Legislature (Statutes 1953, Vol. 1, pp. 272, 405) memorialized the Department of Public Works and the State Engineer (predecessors of the Board) in issuing permits and licenses for use of water for irrigation in connection with Federal reclamation projects to give consideration to issuing such permits and licenses to public agencies of the State contracting with the United States for project water supplies rather than to the United States, and that conditions be included to the effect that such public

agencies together with the landowners therein are and shall be the
beneficiaries of each permit and that the rights of the agencies and
landowners to be served with water are, subject to application of the
water to beneficial uses, permanent and appurtenant to the lands
upon which the water is used.

Consideration has been given to each of the matters referred
to in the above-mentioned resolutions.  It is concluded that permits
should be issued to the applicant United States, subject to substan-
tially the conditions as specified in the resolutions.  By this pro-
cedure, jurisdiction will be maintained of the agency owning, con-
trolling and operating the principal project works on the Santa Ynez
River and thus operation of the project in compliance with state
law and the terms of the permits will be assured.

### The California Water Plan

### Santa Barbara Group

Pursuant to legislative authorization (Stats. 1947, Ch. 1541)
the Department of Water Resources and its predecessors have prepared
a general and coordinated plan, known as "The California Water Plan",
for the development, utilization and conservation of the water re-
sources of the State.  The report presenting this plan has been
published as Bulletin No. 3, Department of Water Resources, "The
California Water Plan", May, 1957 (SWRB Exh. 6).

At the present time, there are three surface storage develop-
ments of significant size on the upper reaches of the Santa Ynez
River; namely, Jameson Lake with an initial storage capacity of 6,700

-27-

acre-feet; Gibraltar Reservoir, with an initial capacity of 14,500 acre-feet; and Cachuma Reservoir.  Two smaller dams, Mono and Caliente, were constructed to reduce the quantity of silt entering Gibraltar Reservoir, but are now completely filled with silt.  The storage capacity of Gibraltar reservoir was reduced to such an extent by silt by 1948, that the dam had to be raised to restore the capacity.  Water conserved by these reservoirs is conveyed by tunnels through the Santa Ynez Mountains for use in or adjacent to the City of Santa Barbara.

Plans discussed in Bulletin No. 3 for further development of local water resources of the "Santa Barbara Group" are limited to the further control of the Santa Ynez River.  Because of the relatively small amount of water available for further development, the objective of The California Water Plan in the group would neces-sarily be accomplished by an import of water from areas of surplus in other parts of the State.

It is assumed in Bulletin No. 3 that the safe yield from the existing surface developments on the Santa Ynez River will con-tinue to serve lands in the area south of the Santa Ynez Mountains, and that any additional yield developed will be utilized to serve lands within the watershed of the river.  Possible local developments include Camuesa Reservoir on Santa Ynez River and Salsipuedes Reser-voir on Salsipuedes Creek.

Camuesa Reservoir would be formed by construction of a dam upstream from Gibraltar Dam and would create a reservoir with storage capacity of 110,000 acre-feet, and a net safe seasonal yield of 5,800 acre-feet.

-28-

Salsipuedes Reservoir would be formed by a dam on Salsipuedes Creek about two and one-half miles upstream from its confluence with the Santa Ynez River.  The reservoir would have a storage capacity of 46,000 acre-feet, and a net safe seasonal yield of 5,400 acre-feet.

Waters conserved by Camuesa Reservoir would be released into the channel of the Santa Ynez River, passing through Cachuma Reservoir, for diversion to lands adjacent to the river downstream from Cachuma.

### Protection to the Watershed of Origin

In previous decisions the Board has had occasion to refer to the public policy of the State to extend to areas in which water originates assurance that they shall not be deprived of water required for their future needs by export of such water to areas of deficient water supply, and to the obligation of the Board to condition appropriations of water in the public interest (see Decisions Nos. D 869 and D 884, citing Water Code Sections 232, 1253, 1255, 1257, and Concurrent Resolutions of the Assembly and Senate, Statutes of 1953, Vol. I, pp. 272, 405).

The United States has committed itself to operate the Cachuma Project so as not to export water from the watershed of the Santa Ynez River which is, or will be, required to maintain natural percolation below Cachuma Dam, and the Board has declared its intention to retain jurisdiction for the purpose of requiring sufficient releases of water to fully accomplish this purpose.

It is shown in the record that the ultimate water requirements in the Santa Ynez River Basin exceed the available developed

-29-

supply by about 4,450 acre-feet per year below Cachuma Dam (USBR Exh. 47). It is also shown that this ultimate supplemental requirement can be met by construction of additional storage facilities within the basin (SWRB Exh. 6).

There is no evidence before the Board of future water requirements on lands within the watershed above Cachuma Dam, although Bulletin 2 of the State Water Resources Board (SWRB Exh. 5) indicates that the extent of irrigable lands in this area is small. Insofar as such lands are presently served with water under prior rights or are riparian to surface streams or are supplied by ground water percolating from surface streams, their right to receive water for beneficial use is, and will remain, prior to rights to be acquired under permits issued to the United States.

The Board concludes that issuance of permits to the United States on the conditions indicated in this decision will not conflict with the aforementioned policy concerning protection to watersheds of origin.

## Conclusions

The Board finds that there is unappropriated water in the sources named in the subject applications which water may be appropriated to a substantial extent in the manner proposed without injury to any other lawful user of water, that the intended uses are beneficial and that said applications should be approved and permits issued to applicant subject to the usual terms and conditions and subject to those additional terms and conditions indicated in this

-30-

decision for the protection of prior rights and in the public interest. The Board further finds that as so conditioned, the appropriations will best develop, conserve and utilize in the public interest the water sought to be appropriated.

The Board further finds that it is necessary for the Board to retain jurisdiction to the extent and for such period of time as may be reasonably necessary for the determination of stream flow of the Santa Ynez required for protection of vested rights without resulting in waste into the ocean.

## ORDER

Applications 11331, 11332, 11761, 11762 and 11989 for permits to appropriate unappropriated water having been filed with the former Division of Water Resources, protests having been filed, jurisdiction of the administration of water rights, including the subject applications, having been subsequently transferred to the State Water Rights Board and a public hearing having been held by the Board, and said Board now being fully informed in the premises:

IT IS HEREBY ORDERED that Applications 11331, 11332, 11761, 11762 and 11989 be, and the same are, hereby approved, and it is ordered that permits be issued to the applicant subject to vested rights and to the following terms and conditions, to wit:

1. The amount of water to be appropriated shall be limited to the amount which can be beneficially used.

2. The amount of water to be appropriated under permit issued pursuant to Application 11331 shall not exceed 100 cubic

-31-

feet per second by direct diversion between January 1 and December 31 of each year, and 275,000 acre-feet per annum by storage to be collected between about October 1 of each year and about June 30 of the following year.

3.  The amount of water to be appropriated under permit issued pursuant to Application 11332 shall not exceed 50 cubic feet per second by direct diversion between January 1 and December 31 of each year, and 275,000 acre-feet per annum by storage to be collected between about October 1 of each year and about June 30 of the following year.

4.  The total amount of water to be appropriated by storage for all purposes under permits issued pursuant to Applications 11331 and 11332 shall not exceed 275,000 acre-feet per annum.

5.  The amount of water to be appropriated under permit issued pursuant to Application 11761 shall not exceed 15 cubic feet per second by direct diversion between January 1 and December 31 of each year, and 500 acre-feet per annum by storage to be collected between about October 1 of each year and about June 30 of the following year.

6.  The amount of water to be appropriated under permit issued pursuant to Application 11762 shall not exceed 15 cubic feet per second by direct diversion between January 1 and December 31 of each year, and 500 acre-feet per annum by storage to be collected between about October 1 of each year and about June 30 of the following year.

7.  The total amount of water to be appropriated by storage

-32-

for all purposes under permits issued pursuant to Applications 11761 and 11762 shall not exceed 500 acre-feet per annum.

8.   The amount of water to be appropriated under permit issued pursuant to Application 11989 shall not exceed 24 cubic feet per second by direct diversion between January 1 and December 31 of each year, and 500 acre-feet per annum by storage to be collected between about October 1 of each year and about June 30 of the following year.

9.   The maximum amounts herein stated may be reduced in the licenses if investigation so warrants.

10.   All rights and privileges under these permits, including method of diversion, method of use and quantity of water diverted, are subject to the continuing authority of the State Water Rights Board in accordance with law and in the interest of the public welfare to prevent waste, unreasonable use, unreasonable method of use or unreasonable method of diversion of water.

11.   Permittee shall release water into the Santa Ynez River channel from Cachuma Reservoir in such amounts and at such times and rates as will be sufficient, together with inflow from downstream tributary sources, to supply downstream diversions of the surface flow under vested prior rights to the extent water would have been available for such diversions from unregulated flow, and sufficient to maintain percolation of water from the stream channel as such percolation would occur from unregulated flow, in order that operation of the project shall not reduce natural recharge of ground water from the Santa Ynez River.

-33-

12. Until further order of the Board permittee shall make or cause to be made suitable field investigations, measurements, and studies, and shall install necessary measuring facilities, to determine the amount, timing, and rate of releases of water into the natural channel of the Santa Ynez River below Cachuma Dam that are required of permittee in order to fully comply with the provisions of condition No. 11 in this permit. Permittee shall provide the necessary measuring devices and shall submit to the Board with the annual progress reports, or at such other times as the Board may require, a report of such investigations, measurements, and studies and the results thereof, including but not limited to the following:

(a) A continuous record of Cachuma Reservoir water surface elevations.

(b) A continuous record of precipitation near Cachuma Dam and at one or more other points near Cachuma Reservoir.

(c) Daily evaporation, wind movement, precipitation, and temperature near Cachuma Dam and at one or more other points near Cachuma Reservoir.

(d) Daily inflow to Cachuma Reservoir, including underground flows, by proper computations of tunnel diversions, reservoir releases, spills, and change in storage.

(e) Stream flow records by suitable measuring structures to determine inflows to Cachuma Reservoir from the Santa Ynez River, Santa Cruz Creek and Cachuma Creek.

(f) Records of flow of springs tributary to Santa Ynez River as may be necessary to determine the effect of Tecolote Tunnel on the discharge of such springs.

-34-

(g)   Continuous records of outflow from Cachuma Reservoir, including flows through river outlets at Cachuma Dam, inflows and outflows through Tecolote Tunnel, and overflows at Cachuma spillway. Instruments suitable for accurate measurement of small outflows shall be installed.

(h)   Continuing ground water studies in the Santa Ynez Basin, with spring and fall observation of all wells in the Basin and monthly observations of wells located within the Santa Ynez River Valley between Cachuma Dam and Mission Bridge near Solvang, and within one mile of the Santa Ynez River downstream from this latter point.

(i)   Periodic surveys of the Santa Ynez River channel to determine consumptive use by native vegetation.

(j)   Quarterly water quality analyses of surface and ground water downstream from Cachuma Dam at locations approved by the Board.

(k)   Estimate of augmentation each water year from the Santa Ynez River to underground supply below Cachuma Dam, together with supporting data.

Permittee shall make its records of such investigations and measurements available for inspection by the Board and shall allow authorized representatives of the Board, Santa Barbara County Water Agency and member units, City of Lompoc, and United States military installation at Camp Cook, reasonable access to its project works and properties for the purpose of gathering information and data, to the extent not inconsistent with national defense.

-35-

13.   The Board, either upon the request of any party or on its own motion, may, and shall, prior to the expiration of a 15-year trial period, hear, review, and make such further and different orders as may be required concerning proper releases of water for downstream use and recharge of ground water, and concerning the investigations, measurements, and studies to be conducted by permittee, until a final determination and order can be made concerning the amounts, timing and rates of releases of water past Cachuma Dam in satisfaction of downstream rights, and the Board retains continuing jurisdiction for such purposes during said 15-year trial period, or for such further time prior to issuance of license as the Board may determine upon notice and hearing to be reasonably necessary for the aforesaid purposes.

14.   All releases of water past Cachuma Dam shall be made in such a manner as to maintain a permanent live stream at all times as far below said dam as possible, consistent with the purposes of the project and the requirements of downstream users.

15.   The right to divert and store water, and apply said water to beneficial use as provided in the permits is granted to the United States as trustee for the benefit of the public agencies of the State together with the owners of land and water users within such public agencies as shall be supplied with the water appropriated under the permits.

16.   Subject to compliance by the public agencies concerned with any and all present and future valid contractual obligations with the United States, such public agencies, on behalf of their

-36-

landowners and other water users, shall, consistent with other terms of the permits, have the permanent right to the use of all water appropriated and beneficially used hereunder, which right shall be appurtenant to the land to which said water shall be applied, subject to continued beneficial use and the right to change the point of diversion, place of use and purpose of use, as provided in Chapter 10 of Part 2 of Division 2 of the Water Code of the State of California, and further subject to the right to dispose of a temporary surplus.

17.  Upon completion of the appropriation and beneficial use of water under the permits, any license or licenses which may be issued pursuant to Chapter 9 of Part 2 of Division 2 of the California Water Code shall be issued to the public agencies of the State within which the water shall have been found by inspection by the Board to have been applied to beneficial use.

18.  Construction work shall be completed on or before December 1, 1960.

19.  Complete application of the water to the proposed use shall be made on or before December 1, 2000.

Adopted as the decision and order of the State Water Rights Board at a meeting duly called and held at Sacramento, California, on the 28th day of February, 1958.

/s/ Henry Holsinger
Henry Holsinger, Chairman


/s/ W. P. Rowe
W. P. Rowe, Member

-37-

# Exhibit 2

Application No. 11761   Filed   March 7, 1947   at 1:59 P. M.

<span style="text-align:center">(Applicant must not fill in the above blanks)</span>

# APPLICATION TO APPROPRIATE UNAPPROPRIATED WATER

### AMENDED APPLICATION RECEIVED FEBRUARY 29, 1952

I, __The United States of America, by the U. S. Bureau of Reclamation__ OVER

<span>Name of applicant</span>

of __P. O. Box 2511, Sacramento 11,__   County of __Sacramento__

<span>Address</span>

State of __California__ , do hereby make application for a permit to appropriate the

following described unappropriated waters of the State of California, *SUBJECT TO VESTED RIGHTS:*

## Source, Amount, Use and Location of Diversion Works

1. The source of the proposed appropriation is __Lauro Creek, also called Diablo Creek__

<span>Give name of stream, lake, etc., if named; if unnamed state nature of source and that it is unnamed</span>

located in __Santa Barbara__ County, tributary to __San Roque Creek, thence Pacific Ocean__

2. The amount of water which applicant desires to appropriate under this application is as follows:
   **(See supplement)**

   (a) For diversion to be directly applied to beneficial use __15__ cubic feet per

   <span>1 cubic foot per second equals 40 statute miner's inches or 646,317 gallons per day</span>

   second, to be diverted from __January 1__ to __December 31__ of each year.

   <span>Beginning date</span>    <span>Closing date</span>

   (b) For diversion to be stored and later applied to beneficial use __500__ acre-feet

   <span>1 acre-foot equals 325,851 gallons</span>

   per annum, to be collected between __October 1__ and __June 30__ of each season.

   <span>Beginning date</span>    <span>Closing date</span>

   NOTE.—Answer (a) or (b) or both (a) and (b) as may be necessary. If amount under (a) is less than .025 cubic foot per second, state in gallons per day. Neither the amount nor the season may be increased after application is filed. If underground storage is proposed a special supplemental form will be supplied by the State Water Rights Board upon request.

3. The use to which the water is to be applied is __irrigation and domestic__

   <span>Domestic, irrigation, power, municipal, mining, industrial, recreational</span>

   purposes.

4. The point of diversion is to be located __north 43° 00' west, and 1,900 feet from the SE__

   <span>State bearing and distance or coordinate distances from section or quarter section corner</span>

   __corner of projected Section 5, T4N, R27W, SBB&M__

   being within the __NE¼ of SE¼__

   <span>State 40-acre subdivision of public land survey or projection thereof</span>

   of Section __5__ , T. __4N__ , R. __27W__ , __SB__ B. & M., in the County of __Santa Barbara__

5. The main conduit terminates in __NW¼ of NE¼__ of Sec. __27__ , T. __4N__ , R. __25W__ , __SB__ B. & M.

   <span>State 40-acre subdivision of U. S. Government survey or projection thereof</span>

## Description of Diversion Works

NOTE.—An application cannot be approved for an amount grossly in excess of the estimated capacity of the diversion works.

6. Intake or Headworks **(fill only those blanks which apply)**

   (a) Diversion will be made by pumping from

   <span>Sump, offset well, unobstructed channel, etc.</span>

   (b) Diversion will be by gravity, the diverting dam being feet in height (stream bed to

   level of overflow); feet long on top; and constructed of

   <span>Concrete, earth, brush, etc.</span>

   (c) The storage dam will be __110__ feet in height (stream bed to overflow level); __540__ feet

   long on top; have a freeboard of __8.3__ feet, and be constructed of __earth__

   <span>Concrete, earth, etc.</span>

7. Storage Reservoir __Lauro Dam__

   <span>Name</span>

of construction

(b) Pipebox Diameter _____ inches; length _____ 900 _____ feet; grade _____ feet per

XXXXXXX; total fall/lift from intake to outlet _____ 44 _____ feet; kind _____ **concrete-lined**

**Conduit connects onto South Coast Conduit**

NOTE.—If a combination of different sizes or kinds of conduit is to be used, attach extra sheets with complete description, also show location of each clearly on map.

9. The estimated capacity of the diversion conduit XXXXXXXXXX proposed is _____ 55 cubic feet per second

State cubic feet per second or gallons per minute

The estimated cost of the diversion works proposed is _____ **$1,200,000.00**

Give only cost of intake, or headworks, pumps, storage reservoirs and main conduits described herein

## Completion Schedule

10. Construction work will begin on or before _____ already begun

Construction work will be completed on or before _____ 1954

The water will be completely applied to the proposed use on or before _____ 1960

## Description of Proposed Use

11. **Place of Use.** **Within Townships 4N and 5N, and within Ranges 29W to 25W. Gross**

State 40-acre subdivisions of the public land survey. If area is unsurveyed indicate the location as if lines of the public land

**acreage, 34,500; net irrigable, 24,300, and more particularly indicated on U.S.B.R.**

survey were projected. In the case of irrigation use state the number of acres to be irrigated in each 40-acre tract, if space permits. If space does not permit listing of all

**Map S7131C. (See supplement)**

40-acre tracts, describe area in a general way and show detail upon map.

Do(es) applicant(s) own the land whereon use of water will be made? **No** Jointly? _____

Yes or No                  Yes or No

**Contracts are or will be negotiated with representatives.**

If applicant does not own land whereon use of water will be made, give name and address of owner and state what arrangements have been made with him.

12. **Other Rights.** Describe all rights except those on file with the State Water Rights Board under which water is served to the above named lands.

| Nature of Right (riparian, appropriative, purchased water, etc.) | Year of First Use | Use made in recent years including amount if known | Season of Use | Source of Other Supply |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |

Attach supplement at top of page 3 if necessary.

13. **Irrigation Use.** The area to be irrigated is _____ 24,300 _____ acres.

State net acreage to be irrigated

The segregation of acreage as to crops is as follows: **General crop segregation will be citrus, orchards,**

**cereals, garden produce and other crops adaptable to the area.**

NOTE.—Care should be taken that the various statements as to acreage are consistent with each other, with the statement in Paragraph 11, and with the map.

The irrigation season will begin about _____ **January 1** _____ and end about _____ **December 31**

Beginning date                  Closing date

14. **Power Use.** The total fall to be utilized is _____ feet.

Difference between nozzle or draft tube water level and first free water surface above

The maximum amount of water to be used through the penstock is _____ cubic feet per second.

The maximum theoretical horsepower capable of being generated by the works is _____ horsepower.

Second feet × fall ÷ 8.8

The use to which the power is to be applied is _____

For distribution and sale or private use, etc.

The nature of the works by means of which power is to be developed is _____

Turbine, Pelton wheel, etc.

The size of the nozzle to be used is _____ inches.

## SUPPLEMENT TO APPLICATION 11761

### General Statement

Lauro Reservoir is to be used in conjunction with the South Coast Conduit to provide regulatory and standby storage primarily for the Goleta County Water District and the City of Santa Barbara. In addition, the reservoir will provide, under certain emergency conditions, a source of supply for the Carpinteria section of the conduit which will serve the Montecito, Carpinteria, and Summerland County Water Districts.

### Supplement to Paragraph 2:  AMOUNT OF WATER

The quantities indicated under (a) and (b) will be the same water applied for under Application 11762 for municipal and industrial purposes. There will arise such occasions when all the water applied for will be used for irrigation or municipal use, or to serve both purposes simultaneously. Under no conditions will the combined use exceed the amount for which application has been made.

27

The estimated average daily consumption during the month of maximum use at the end of each five-year period until the full amount applied for is put to beneficial use is as follows:

16. **Mining Use.** The name of the mining property to be served is _____

<p style="text-align:center"><small>Name of claim</small></p>

_____and the nature of the mines is _____

<p style="text-align:center"><small>Gold placer, quartz, etc.</small></p>

The method of utilizing the water is _____

It is estimated that the ultimate water requirement for this project will be _____

<p style="text-align:center"><small>Cubic feet per second, gallons per minute. State basis of estimate</small></p>

The water will / will not be polluted by chemicals or otherwise _____

<p style="text-align:center"><small>Explain nature of pollution, if any</small></p>

and it will / will not be returned to _____ in _____ of

<small>Name stream                                   State 40-acre subdivision</small>

Sec._____, T._____, R._____, _____ B. & M.

17. **Other Uses.** The nature of the use proposed is   **domestic**

<p style="text-align:center"><small>Industrial, recreational, domestic, stockwatering, fish culture, etc.</small></p>

State basis of determination of amount needed. **Household, garden and stock**

<small>Number of persons, residences, area of domestic lawns and gardens, number and kind of stock, type industrial use, and unit requirements.</small>

# General

18. Are the maps as required by the Rules and Regulations filed with Application? **Yes**_____ If not,

<small>Yes or No</small>

state specifically the time required for filing same _____

19. Does the applicant own the land at the proposed point of diversion? **Yes**_____ If not, give name and

<small>Yes or No</small>

address of owner and state what steps have been taken to secure right of access thereto _____

20. What is the name of the post office most used by those living near the proposed point of diversion?

**Santa Barbara**

21. What are the names and addresses of claimants of water from the source of supply below the proposed point of

diversion? **Unknown**

1.  The amount of water to be appropriated shall be limited to the amount which can be beneficially used and shall not exceed 15 cubic feet per second by direct diversion between January 1 and December 31 of each year, and 500 acre-feet per annum by storage to be collected between about October 1 of each year and about June 30 of the following year.

2.  The total amount of water to be appropriated by storage for all purposes under permits issued pursuant to Applications 11761 and 11762 shall not exceed 500 acre-feet per annum.

3.  The maximum amounts herein stated may be reduced in the licenses if investigation so warrants.

4.  All rights and privileges under these permits, including method of diversion, method of use and quantity of water diverted, are subject to the continuing authority of the State Water Rights Board in accordance with law and in the interest of the public welfare to prevent waste, unreasonable use, unreasonable method of use or unreasonable method of diversion of water.

5.  The right to divert and store water, and apply said water to beneficial use as provided in the permits is granted to the United States as trustee for the benefit of the public agencies of the State together with the owners of land and water users within such public agencies as shall be supplied with the water appropriated under the permits.

6.  Subject to compliance by the public agencies concerned with any and all present and future valid contractual obligations with the United States, such public agencies, on behalf of their landowners and other water users, shall, consistent with other terms of the permits, have the permanent right to the use of all water appropriated and beneficially used hereunder, which right shall be appurtenant to the land to which said water shall be applied, subject to continued beneficial use and the right to change the point of diversion, place of use and purpose of use, as provided in Chapter 10 of Part 2 of Division 2 of the Water

Code of the State of California, and further subject to the right to dispose of a temporary surplus.

7.  Upon completion of the appropriation and beneficial use of water under the permits, any license or licenses which may be issued pursuant to Chapter 9 of Part 2 of Division 2 of the California Water Code shall be issued to the public agencies of the State within which the water shall have been found by inspection by the Board to have been applied to beneficial use.

8.  Construction work shall be completed on or before December 1, 1960.

9.  Complete application of the Water to the proposed use shall be made on or before December 1, 2000.

3'

1. The amount of water appropriated shall be limited to the amount which can be beneficially used, and shall not exceed

by the State Water Rights Board SUBJECT TO VESTED RIGHTS and the following limitations and conditions:

2. The maximum amount herein stated may be reduced in the license if investigation so warrants.

3. Actual construction work shall begin on or before                                          and shall thereafter be prosecuted with reasonable diligence, and if not so commenced and prosecuted this permit may be revoked.

4. Said construction work shall be completed on or before

5. Complete application of the water to the proposed use shall be made on or before

6. Progress reports shall be filed promptly by permittee on forms which will be provided annually by the State Water Rights Board until license is issued.

7. All rights and privileges under this permit including method of diversion, method of use and quantity of water diverted are subject to the continuing authority of the State Water Rights Board in accordance with law and in the interest of the public welfare to prevent waste, unreasonable use, unreasonable method of use or unreasonable method of diversion of said water.

*This permit is issued and permittee takes it* subject to the following provisions of the Water Code:

Section 1390.  A permit shall be effective for such time as the water actually appropriated under it is used for a useful and beneficial purpose in conformity with this division (of the Water Code), but no longer.

Section 1391.  Every permit shall include the enumeration of conditions therein which in substance shall include all of the provisions of this article and the statement that any appropriator of water to whom a permit is issued takes it subject to the conditions therein expressed.

Section 1392.  Every permittee, if he accepts a permit, does so under the conditions precedent that no value whatsoever in excess of the actual amount paid to the State therefor shall at any time be assigned to or claimed for any permit granted or issued under the provisions of this division (of the Water Code), or for any rights granted or acquired under the provisions of this division (of the Water Code), in respect to the regulation by any competent public authority of the services or the price of the services to be rendered by any permittee or by the holder of any rights granted or acquired under the provisions of this division (of the Water Code) or in respect to any valuation for purposes of sale to or purchase, whether through condemnation proceedings or otherwise, by the State or any city, city and county, municipal water district, irrigation district, lighting district, or any political subdivision of the State, of the rights and property of any permittee, or the possessor of any rights granted, issued, or acquired under the provisions of this division (of the Water Code).

Dated:  **MAR 1 9 1958**                          STATE WATER RIGHTS BOARD

                                                        L. K. Hill

                                                    L. K. Hill



2-1-80 Name chgd. To us. Water + power Res. service

Ex. 2
p. 66

# IMPORTANT
## [Please Read Carefully]

1. *Note the terms and conditions of this permit.* Construction work must be prosecuted, and the water applied to the beneficial uses intended with due diligence. Annual reports of progress will be expected from you upon forms which will be furnished for the purpose. When the water has been fully applied to the beneficial uses intended the Water Code requires that you notify the State Water Rights Board thereof.

2. Neither this application nor the permit is a water right, but *if the terms and conditions of the permit are observed a water right can be obtained through beneficial use of the water*—the extent of the right to be determined by a field inspection which will be made by a representative of the State Water Rights Board.

3. *No change in point of diversion, or place of use or character of use, can be made under this application and permit* without the approval of the State Water Rights Board.

4. *If the rights under this permit are assigned* immediate notice to that effect with the name and address of the new owner should be forwarded to the State Water Rights Board, Sacramento, California.

5. *Please advise immediately of any change of address.* Until otherwise advised communications will be sent to the address used in the letter transmitting this permit.

Ex. 2
p. 67

# Exhibit 3

**Application No.** 11762    **Filed** March 7, 1947    at 1:59 P. M.

<small>(Applicant must not fill in the above blanks)</small>

# APPLICATION TO APPROPRIATE UNAPPROPRIATED WATER

## AMENDED APPLICATION RECEIVED FEBRUARY 29, 1952

I, The United States of America, by the U. S. Bureau of Reclamation    OVER

<small>Name of applicant</small>

of P. O. Box 2511, Sacramento 11    County of Sacramento

<small>Address</small>

State of California    , do hereby make application for a permit to appropriate the

following described unappropriated waters of the State of California, *SUBJECT TO VESTED RIGHTS:*

## Source, Amount, Use and Location of Diversion Works

1. The source of the proposed appropriation is Lauro Creek, also called Diablo Creek

<small>Give name of stream, lake, etc., if named; if unnamed state nature of source and that it is unnamed</small>

located in Santa Barbara County, tributary to San Roque, thence Pacific Ocean

2. **The amount of water** which applicant desires to appropriate under this application is as follows:

    **(See supplement)**

    (a) For diversion to be directly applied to beneficial use 15 cubic feet per

    <small>1 cubic foot per second equals 40 statute miner's inches or 646,317 gallons per day</small>

    second, to be diverted from January 1 to December 31 of each year.

    <small>Beginning date            Closing date</small>

    (b) For diversion to be stored and later applied to beneficial use 500 acre-feet

    <small>1 acre-foot equals 325,851 gallons</small>

    per annum, to be collected between October 1 and June 30 of each season.

    <small>Beginning date            Closing date</small>

    NOTE.—Answer (a) or (b) or both (a) and (b) as may be necessary. If amount under (a) is less than .025 cubic foot per second, state in gallons per day. Neither the amount nor the season may be increased after application is filed. If underground storage is proposed a special supplemental form will be supplied by the State Water Rights Board upon request.

3. **The use** to which the water is to be applied is for municipal and industrial

    <small>Domestic, irrigation, power, municipal, mining, industrial, recreational</small>

    purposes.

4. **The point of diversion** is to be located north 43° 00' west, and 1,900 feet from the SE

    <small>State bearing and distance or coordinate distances from section or quarter section corner</small>

    corner of projected Section 5, T4N, R27W, SBB&M

    being within the NE¼ of SE¼

    <small>State 40-acre subdivision of public land survey or projection thereof</small>

    of Section 5 , T. 4N , R. 27W SB B. & M., in the County of Santa Barbara

5. **The main conduit** terminates in NW¼ of NE¼ of Sec. 27 , T. 4N , R. 25W , SB B. & M.

    <small>State 40-acre subdivision of U.S. Government survey or projection thereof</small>

## Description of Diversion Works

NOTE.—An application cannot be approved for an amount grossly in excess of the estimated capacity of the diversion works.

6. **Intake or Headworks** (fill only those blanks which apply)

    (a) Diversion will be made by pumping from

    <small>Sump, offset well, unobstructed channel, etc.</small>

    (b) Diversion will be by gravity, the diverting dam being feet in height (stream bed to

    level of overflow) ; feet long on top; and constructed of

    <small>Concrete, earth, brush, etc.</small>

    (c) The storage dam will be 110 feet in height (stream bed to overflow level) ; 540 feet

    long on top; have a freeboard of 8.3 feet, and be constructed of earth

    <small>Concrete, earth, etc.</small>

7. **Storage Reservoir** Lauro Dam

    <small>Name</small>

of construction

Horseshoe Conduit 8.0 feet enclosing 54" steel pipe hydraulic gradient .049

(b) ~~HEIGHT~~ Diameter ............ ~~WIDTH~~ length ...... 900 ...... feet; grade ............................. feet per

1,000 feet; total ~~fall lift~~ from intake to outlet ...... 44 ...... feet; kind ...... concrete-lined ......

Riveted steel, concrete, wood-stave, etc.

Conduit connects onto South Coast Conduit

NOTE.—If a combination of different sizes or kinds of conduit is to be used, attach extra sheets with complete description, also show location of each clearly on map.

9. The estimated capacity of the diversion conduit ~~xxxxxxxxxxxx~~ proposed is ...... 55 cubic feet per second

State cubic feet per second or gallons per minute

The estimated cost of the diversion works proposed is ...... $1,200,000.00

Give only cost of intake, or headworks, pumps, storage reservoirs and main conduits described herein

# Completion Schedule

10. **Construction work** will begin on or before ...... already begun ......

Construction work will be completed on or before ...... 1954 ......

The water will be completely applied to the proposed use on or before ...... 1960 ......

# Description of Proposed Use

11. **Place of Use.** Parts of the service area delineated on U.S.B.R. Map S7131C

State 40-acre subdivisions of the public land survey. If area is unsurveyed indicate the location as if lines of the public land

(See Paragraph 15)

survey were projected. In the case of irrigation use state the number of acres to be irrigated in each 40-acre tract, if space permits. If space does not permit listing of all

40-acre tracts, describe area in a general way and show detail upon map.

Do(es) applicant(s) own the land whereon use of water will be made? ...... No ...... Jointly? ..........................

Yes or No      Yes or No

Contracts are or will be negotiated with representatives.

If applicant does not own land whereon use of water will be made, give name and address of owner and state what arrangements have been made with him.

12. **Other Rights.** Describe all rights except those on file with the State Water Rights Board under which water is served to the above named lands.

| Nature of Right (riparian, appropriative, purchased water, etc.) | Year of First Use | Use made in recent years including amount if known | Season of Use | Source of Other Supply |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |

Attach supplement at top of page 3 if necessary.

13. **Irrigation Use.** The area to be irrigated is ........................................................................................ acres.

State net acreage to be irrigated

The segregation of acreage as to crops is as follows: Rice ........................ acres; alfalfa ........................ acres;

orchard ........................ acres; general crops ........................ acres; pasture ........................ acres.

NOTE.—Care should be taken that the various statements as to acreage are consistent with each other, with the statement in Paragraph 11, and with the map.

The irrigation season will begin about ........................ and end about ........................

Beginning date      Closing date

14. **Power Use.** The total fall to be utilized is ........................................................................................ feet.

Difference between nozzle or draft tube water level and first free water surface above

The maximum amount of water to be used through the penstock is ........................................................ cubic feet per second.

The maximum theoretical horsepower capable of being generated by the works is ........................................ horsepower.

Second feet × fall ÷ 8.8

The use to which the power is to be applied is ........................................................................................

For distribution and sale or private use, etc.

The nature of the works by means of which power is to be developed is ........................................................

Turbine, Pelton wheel, etc.

The estimated average daily consumption during the month of maximum use at the end of each five-year period until the full

amount applied for is put to beneficial use is as follows:

1950 – 14,600,000 gallons per day; 1955--16,550,000 gallons per day; 1960 –

18,500,000 gallons per day

16. **Mining Use.** The name of the mining property to be served is
<div align="center" style="font-size:smaller">Name of claim</div>

and the nature of the mines is
<div align="center" style="font-size:smaller">Gold placer, quartz, etc.</div>

The method of utilizing the water is

It is estimated that the ultimate water requirement for this project will be
<div align="center" style="font-size:smaller">Cubic feet per second, gallons per minute. State basis of estimate</div>

The water will / will not be polluted by chemicals or otherwise
<div align="center" style="font-size:smaller">Explain nature of pollution, if any</div>

and it will / will not be returned to _____ in _____ of
<div style="font-size:smaller">Name stream         State 40-acre subdivision</div>

Sec. _____, T. _____, R. _____, _____ B. & M.

17. **Other Uses.** The nature of the use proposed is **domestic**
<div align="center" style="font-size:smaller">Industrial, recreational, domestic, stockwatering, fish culture, etc.</div>

State basis of determination of amount needed. **Household, garden and stock**
<div style="font-size:smaller">Number of persons, residences, area of domestic lawns and gardens, number and kind of stock, type</div>
<div style="font-size:smaller">industrial use, and unit requirements.</div>

# General

18. Are the maps as required by the Rules and Regulations filed with Application? **Yes** . If not,
<div style="font-size:smaller">Yes or No</div>

state specifically the time required for filing same

19. Does the applicant own the land at the proposed point of diversion? **Yes** . If not, give name and
<div style="font-size:smaller">Yes or No</div>

address of owner and state what steps have been taken to secure right of access thereto

20. What is the name of the post office most used by those living near the proposed point of diversion?

Santa Barbara, California

21. What are the names and addresses of claimants of water from the source of supply below the proposed point of

diversion? Unknown

1.  The amount of water to be appropriated shall be limited to the amount which can be beneficially used and shall not exceed 15 cubic feet per second by direct diversion between January 1 and December 31 of each year, and 500 acre-feet per annum by storage to be collected between about October 1 of each year and about June 30 of the following year.

2.  The total amount of water to be appropriated by storage for all purposes under permits issued pursuant to Applications 11761 and 11762 shall not exceed 500 acre-feet per annum.

3.  The maximum amounts herein stated may be reduced in the licenses if investigation so warrants.

4.  All rights and privileges under these permits, including method of diversion, method of use and quantity of water diverted, are subject to the continuing authority of the State Water Rights Board in accordance with law and in the interest of the public welfare to prevent waste, unreasonable use, unreasonable method of use or unreasonable method of diversion of water.

5.  The right to divert and store water, and apply said water to beneficial use as provided in the permits is granted to the United States as trustee for the benefit of the public agencies of the State together with the owners of land and water users within such public agencies as shall be supplied with the water appropriated under the permits.

6.  Subject to compliance by the public agencies concerned with any and all present and future valid contractual obligations with the United States, such public agencies, on behalf of their landowners and other water users, shall, consistent with other terms of the permits, have the permanent right to the use of all water appropriated and beneficially used hereunder, which right shall be appurtenant to the land to which said water shall be applied, subject to continued beneficial use and the right to change the point of diversion, place of use and purpose of use, as provided in Chapter 10 of Part 2 of Division 2 of the Water Code

38

of the State of California, and further subject to the right to dispose of a temporary surplus.

7.  Upon completion of the appropriation and beneficial use of water under the permits, any license or licenses which may be issued pursuant to Chapter 9 of Part 2 of Division 2 of the California Water Code shall be issued to the public agencies of the State within which the water shall have been found by inspection by the Board to have been applied to beneficial use.

8.  Construction work shall be completed on or before December 1, 1960.

9.  Complete application of the water to the proposed use shall be made on or before December 1, 2000.

FORM 61-A

# IMPORTANT
## [Please Read Carefully]

1. *Note the terms and conditions of this permit.* Construction work must be prosecuted, and the water applied to the beneficial uses intended with due diligence. Annual reports of progress will be expected from you upon forms which will be furnished for the purpose. When the water has been fully applied to the beneficial uses intended the Water Code requires that you notify the State Water Rights Board thereof.

2. Neither this application nor the permit is a water right, but *if the terms and conditions of the permit are observed a water right can be obtained through beneficial use of the water*—the extent of the right to be determined by a field inspection which will be made by a representative of the State Water Rights Board.

3. *No change in point of diversion, or place of use or character of use, can be made under this application and permit* without the approval of the State Water Rights Board.

4. *If the rights under this permit are assigned* immediate notice to that effect with the name and address of the new owner should be forwarded to the State Water Rights Board, Sacramento, California.

5. *Please advise immediately of any change of address.* Until otherwise advised communications will be sent to the address used in the letter transmitting this permit.

40017 7 66 3M SPO

Ex. 3
p. 74

2-1-80 Name chgd To U.S. Water + Power Res. Service

Ex. 3
p. 75

## SUPPLEMENT TO APPLICATION 11762

### General Statement

Lauro Reservoir is to be used in conjunction with the South Coast Conduit to provide regulatory and standby storage primarily for the Goleta County Water District and the City of Santa Barbara.  In addition, the reservoir will provide, under certain emergency conditions, a source of supply for the Carpinteria section of the Conduit which will serve the Montecito, Carpinteria, and Summerland County Water Districts.

### Supplement to Paragraph 2:   AMOUNT OF WATER

The quantities indicated under (a) and (b) will be the same water applied for under Application 11761 for irrigation and domestic purposes.  There will arise such occasions when all the water applied for will be used for irrigation or municipal use, or to serve both purposes simultaneously.  Under no conditions will the combined use exceed the amount for which application has been made.

35

1. The amount of water appropriated shall be limited to the amount which can be beneficially used, and shall not exceed

2. The maximum amount herein stated may be reduced in the license if investigation so warrants.

3. Actual construction work shall begin on or before                                        and shall thereafter be prosecuted with reasonable diligence, and if not so commenced and prosecuted this permit may be revoked.

4. Said construction work shall be completed on or before

5. Complete application of the water to the proposed use shall be made on or before

6. Progress reports shall be filed promptly by permittee on forms which will be provided annually by the State Water Rights Board until license is issued.

7. All rights and privileges under this permit including method of diversion, method of use and quantity of water diverted are subject to the continuing authority of the State Water Rights Board in accordance with law and in the interest of the public welfare to prevent waste, unreasonable use, unreasonable method of use or unreasonable method of diversion of said water.

*This permit is issued and permittee takes it* subject to the following provisions of the Water Code:

Section 1390.  A permit shall be effective for such time as the water actually appropriated under it is used for a useful and beneficial purpose in conformity with this division (of the Water Code), but no longer.

Section 1391.  Every permit shall include the enumeration of conditions therein which in substance shall include all of the provisions of this article and the statement that any appropriator of water to whom a permit is issued takes it subject to the conditions therein expressed.

Section 1392.  Every permittee, if he accepts a permit, does so under the conditions precedent that no value whatsoever in excess of the actual amount paid to the State therefor shall at any time be assigned to or claimed for any permit granted or issued under the provisions of this division (of the Water Code), or for any rights granted or acquired under the provisions of this division (of the Water Code), in respect to the regulation by any competent public authority of the services or the price of the services to be rendered by any permittee or by the holder of any rights granted or acquired under the provisions of this division (of the Water Code) or in respect to any valuation for purposes of sale to or purchase, whether through condemnation proceedings or otherwise, by the State or any city, city and county, municipal water district, irrigation district, lighting district, or any political subdivision of the State, of the rights and property of any permittee, or the possessor of any rights granted, issued, or acquired under the provisions of this division (of the Water Code).

Dated:   MAR 1 9 1958                    STATE WATER RIGHTS BOARD

                                         *L. K. Hill*
                                         L. K. Hill

# Exhibit 4

**[SUMMARY OF FINAL SUBMITTED VERSION]**

## PROGRESS REPORT BY PERMITTEE FOR 2018

Primary Owner: U.S. BUREAU OF RECLAMATION
Primary Contact:

Date Submitted: 03/25/2019

Application Number: A011761
Permit Number: 011311

| Source(s) of Water | POD Parcel Number | County |
|---|---|---|
| LAURO CREEK | | Santa Barbara |

MAX Direct Diversion Rate: 15 CFS
MAX Collection to Storage: 500 AC-FT
Face Value: 11359.7 AC-FT

| Permitted Use(s) | Acres | Direct Diversion Season | Storage Season |
|---|---|---|---|
| Domestic | 0 | 01/01 to 12/31 | 10/01 to 06/30 |
| Irrigation | 24300 | 01/01 to 12/31 | 10/01 to 06/30 |

| 1. Permit Review | |
|---|---|
| I have reviewed my water right permit | Yes |

| 2. Compliance with Permit Terms and Conditions | |
|---|---|
| I am complying with all terms and conditions | Yes |
| Description of noncompliance with terms and conditions | |

| 3. Changes to the Project | |
|---|---|
| Intake location has been changed | |
| Description of intake location changes | |
| Type of use has changed | |
| Description of type of use changes | |
| Place of use has changed | |
| Description of place of use changes | |
| Other changes | |
| Description of other changes | |

| 4-6. Permitted Project Status | |
|---|---|
| Project Status | Not Complete |
| 6a. Construction work has commenced | Yes |
| 6b. Construction is completed | No |
| 6c. Beneficial uses of water has commenced | No |
| 6d. Project | No |

| | |
|---|---|
| will be completed within the time period specified in the permit | |
| 6e. Explanation of work remaining to be done | All the runoff from Lauro Creek is diverted upstream of Lauro Reservoir each year. A portion of the watershed (0.26 square miles) drains into Lauro Reservoir Debris Basin. When the water enters the basin it filtrates through rocks and coarse sand material, which reduces contaminants in the water. In 2008, Cachuma Operation and Maintenance Board (COMB) upgraded the debris basin dam and pump system. The water that flows into Lauro Debris basin is routed through the reservoir storm drain into the Lauro Reservoir spillway and then flows into San Roque Creek. |
| 6f. Estimated date of completion | 12/31/2030 |

### 7. Purpose of Use

| | |
|---|---|
| Other | The water that flows into Lauro Debris basin is routed through the reservoir storm drain into the Lauro Reservoir spillway and then flows into San Roque Creek. |

### Special Use Categories

| | |
|---|---|
| C1. Are you using any water diverted under this right for the cultivation of cannabis? | No |

### 8. Maximum Rate of Diversion

| Month | Rate of Diversion |
|---|---|
| January | |
| February | |
| March | |
| April | |
| May | |
| June | |
| July | |
| August | |
| September | |
| October | |
| November | |
| December | |

### 9. Amount of Water Diverted and Used

| Month | Amount directly diverted (Acre-Feet) | Amount diverted or collected to storage (Acre-Feet) | Amount used (Acre-Feet) |
|---|---|---|---|
| January | 0 | 0.37 | 0.15 |
| February | 0 | 0.15 | 0.06 |
| March | 0 | 12.84 | 5.07 |
| April | 0 | 0.26 | 0.1 |
| May | 0 | 0.2 | 0.08 |
| June | 0 | 0.07 | 0.03 |
| July | 0 | 0 | 0 |
| August | 0 | 0 | 0 |
| September | 0 | 0 | 0 |
| October | 0 | 0 | 0 |

| | | | |
|---|---|---|---|
| November | 0 | 0.28 | 0.11 |
| December | 0 | 0 | 0 |
| Total | 0 | 14.17 | 5.6 |
| Type of Diversion | Diversion to Storage Only | | |
| Comments | The water that flows into Lauro Debris basin is routed through the reservoir storm drain into the Lauro Reservoir spillway and then flows into San Roque Creek. | | |

| Water Transfers | |
|---|---|
| 9d. Water transfered | No |
| 9e. Quantity transfered (Acre-Feet) | |
| 9f. Dates which transfer occurred | / to / |
| 9g. Transfer approved by | |

| Water Supply Contracts | |
|---|---|
| 9h. Water supply contract | No |
| 9i. Contract with | |
| 9j. Other provider | |
| 9k. Contract number | |
| 9l. Source from which contract water was diverted | |
| 9m. Point of diversion same as identified water right | |
| 9n. Amount (Acre-Feet) authorized to divert under this contract | |
| 9o. Amount (Acre-Feet) authorized to be diverted in 2018 | |
| 9p. Amount (Acre-Feet) projected for 2019 | |
| 9q. Exchange or settlement of prior rights | |
| 9r. All monthly reported diversion claimed under the prior rights | |
| 9s. Amount (Acre-Feet) of reported diversion solely under contract | |

| 10. Water Diversion Measurement | |
|---|---|
| a. Required to measure as of the date this report is submitted | Yes |
| b. Is diversion measured? | No |
| c. An alternative compliance plan was submitted to the division of water rights on | |
| d. A request for additional time was submitted to the division of water rights on | |

| Measurement Attachments | | | |
|---|---|---|---|
| Measurement ID Number | File Name | Description | Size |
| No attachments | | | |

| Measurement Data Files | | | |
|---|---|---|---|
| Measurement ID Number | File Name | Description | Size |
| No data files | | | |

| 11. Storage | | | | | |
|---|---|---|---|---|---|
| Reservoir name | Spilled this year | Feet below spillway at maximum storage | Completely emptied | Feet below spillway at minimum storage | Method used to measure water level |
| Lauro Dam | No | 0 | No | 0 | No data collected |

| Conservation of Water | |
|---|---|
| 12. Are you now employing water conservation efforts? | No |
| Description of water conservation efforts | |

Ex. 4
p. 81

13. Amount of water conserved

| **Water Quality and Wastewater Reclamation** | |
|---|---|
| 14. During the period covered by this Report, did you use reclaimed water from a wastewater treatment facility, water from a desalination facility, or water polluted by waste to a degree which unreasonably affects the water for other beneficial uses? | No |
| 15. Amount of reclaimed, desalinated, or polluted water used | |

| **Conjuctive Use of Groundwater and Surface Water** | |
|---|---|
| 16. During the period covered by this Report, were you using groundwater in lieu of available surface water authorized under your permit? | No |
| 17. Amounts of groundwater used | |

| **Additional Remarks** |
|---|
| All the runoff from Lauro Creek is diverted upstream of Lauro Reservoir each year. A portion of the watershed (0.26 square miles) drains into Lauro Reservoir Debris Basin. When the water enters the basin it filtrates through rocks and coarse sand material, which reduces contaminants in the water. In 2008, Cachuma Operation and Maintenance Board (COMB) upgraded the debris basin dam and pump system. The water that flows into Lauro Debris basin is routed through the reservoir storm drain into the Lauro Reservoir spillway and then flows into San Roque Creek. The volume of water diverted in 2018 is estimated based on the area-weighted runoff method using the San Jose Creek USGS gaging station (11120500 SAN JOSE C NR GOLETA CA). This is the stream gaging station and method on which the original water right was based. Table 1 provides the monthly diverted volumes for each subwatershed in Lauro Creek and the overall total volume. |

| **Attachments** | | |
|---|---|---|
| **File Name** | **Description** | **Size** |
| Lauro Creek A011761 and A011762 Diversion Volumes.pdf | Lauro Creek 2018 Diversion | 76 KB |

| **Contact Information of the Person Submitting the Form** | |
|---|---|
| First Name | Claire |
| Last Name | Hsu |
| Relation to Water Right | Primary Owner of Record |

| **Information on Certification and Signatory** | |
|---|---|
| Name of Person Signing and Certifying the Report | Claire Hsu |
| Date of Signature | 03/25/2019 |

Lauro Creek (A011761, A011762) - Diversion Volume - Calendar Year 2018

| Year | Month | San Jose Creek Monthly Streamflow (5.54 square miles) (AF) | Lauro Creek - Diverted for Recharge (0.26 square miles) (AF) | Lauro Creek - Area Diverted for Potable Use (0.17 square miles | Total Diversion (AF) |
|---|---|---|---|---|---|
| 2018 | 1 | 4.74 | 0.22 | 0.15 | 0.37 |
| 2018 | 2 | 1.98 | 0.09 | 0.06 | 0.15 |
| 2018 | 3 | 165.38 | 7.76 | 5.07 | 12.84 |
| 2018 | 4 | 3.39 | 0.16 | 0.10 | 0.26 |
| 2018 | 5 | 2.64 | 0.12 | 0.08 | 0.20 |
| 2018 | 6 | 0.91 | 0.04 | 0.03 | 0.07 |
| 2018 | 7 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2018 | 8 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2018 | 9 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2018 | 10 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2018 | 11 | 3.55 | 0.17 | 0.11 | 0.28 |
| 2018 | 12 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total** | | **182.60** | **8.57** | **5.60** | **14.17** |

# Exhibit 5

**[SUMMARY OF FINAL SUBMITTED VERSION]**

## PROGRESS REPORT BY PERMITTEE FOR 2019

Primary Owner: U.S. BUREAU OF RECLAMATION
Primary Contact:

Date Submitted: 03/25/2020

Application Number: A011761
Permit Number: 011311

| Source(s) of Water | POD Parcel Number | County |
|---|---|---|
| LAURO CREEK | | Santa Barbara |

MAX Direct Diversion Rate: 15 CFS
MAX Collection to Storage: 500 AC-FT
Face Value: 11359.7 AC-FT

| Permitted Use(s) | Acres | Direct Diversion Season | Storage Season |
|---|---|---|---|
| Domestic | 0 | 01/01 to 12/31 | 10/01 to 06/30 |
| Irrigation | 24300 | 01/01 to 12/31 | 10/01 to 06/30 |

| 1. Compliance with Permit Terms and Conditions | |
|---|---|
| I have reviewed my water right permit and I am complying with all terms and conditions | Yes |
| Description of noncompliance with terms and conditions | |

| 2. Changes to the Project | |
|---|---|
| Intake location has been changed | |
| Description of intake location changes | |
| Type of use has changed | |
| Description of type of use changes | |
| Place of use has changed | |
| Description of place of use changes | |
| Other changes | |
| Description of other changes | |

| 3-5. Permitted Project Status | |
|---|---|
| Project Status | Not Complete |
| 5a. Construction work has commenced | Yes |
| 5b. Construction is completed | No |
| 5c. Beneficial uses of water has commenced | Yes |
| 5d. Project will be completed within the time period specified in the permit | No |
| 5e. Explanation of work remaining to be done | In 2008,Cachuma Operation and Maintenance Board (COMB) upgraded the debris basin dam and pump system. The water that flows into Lauro Debris basin is routed through the reservoir storm drain into the Lauro Reservoir spillway and then flows into San Roque Creek. |
| 5f. Estimated date of | 12/31/2030 |

Ex. 5
p. 85

completion

| 6. Purpose of Use | |
|---|---|
| Other | Runoff from the other portion of the Lauro Dam watershed |

| Special Use Categories | |
|---|---|
| C1. Are you using any water diverted under this right for the cultivation of cannabis? | No |

| 7. Amount of Water Diverted and Used | | | |
|---|---|---|---|
| Month | Amount directly diverted (Acre-Feet) | Amount diverted or collected to storage (Acre-Feet) | Amount used (Acre-Feet) |
| January | 0 | 23.42 | 38.74 |
| February | 0 | 40.16 | 66.41 |
| March | 0 | 25.03 | 41.4 |
| April | 0 | 2.23 | 3.68 |
| May | 0 | 2.28 | 3.78 |
| June | 0 | 0.89 | 1.48 |
| July | 0 | 0.25 | 0.41 |
| August | 0 | 0.19 | 0.31 |
| September | 0 | 0 | 0 |
| October | 0 | 0 | 0 |
| November | 0 | 0 | 0 |
| December | 0 | 2.4 | 3.96 |
| Total | 0 | 96.85 | 160.17 |
| Type of Diversion | Diversion to Storage Only | | |
| Comments | Runoff from the other portion of the Lauro Dam watershed (0.17 square miles) flows into Lauro Reservoir and is diverted through the Lauro Dam outlet works for treatment and delivery to domestic and agricultural customers. The volume of water diverted in 2019 is estimated based on the area-weighted runoff method using the San Jose Creek USGS gaging station (11120500 SAN JOSE C NR GOLETA CA). | | |

| 8. Water Diversion Measurement | |
|---|---|
| a. Required to measure as of the date this report is submitted | Yes |
| b. Is diversion measured? | No |
| c. An alternative compliance plan was submitted to the division of water rights on | |
| d. A request for additional time was submitted to the division of water rights on | |

| Measurement Attachments | | | |
|---|---|---|---|
| Measurement ID Number | File Name | Description | Size |
| No attachments | | | |

| Measurement Data Files | | | |
|---|---|---|---|
| Measurement ID Number | File Name | Description | Size |
| No data files | | | |

| 9. Maximum Rate of Diversion | |
|---|---|
| Month | Rate of Diversion |
| January | |
| February | |
| March | |

| April | |
|---|---|
| May | |
| June | |
| July | |
| August | |
| September | |
| October | |
| November | |
| December | |

| **10.Water Transfers** | | |
|---|---|---|
| 10a. Water transfered | | No |
| 10b. Quantity transfered (Acre-Feet) | | |
| 10c. Dates which transfer occurred | | / to / |
| 10d. Transfer approved by | | |

| **Water Supply Contracts** | |
|---|---|
| 10e. Water supply contract | No |
| 10f. Contract with | |
| 10g. Other provider | |
| 10h. Contract number | |
| 10i. Source from which contract water was diverted | |
| 10j. Point of diversion same as identified water right | |
| 10k. Amount (Acre-Feet) authorized to divert under this contract | |
| 10l. Amount (Acre-Feet) authorized to be diverted in 2019 | |
| 10m. Amount (Acre-Feet) projected for 2020 | |
| 10n. Exchange or settlement of prior rights | |
| 10o. All monthly reported diversion claimed under the prior rights | |
| 10p. Amount (Acre-Feet) of reported diversion solely under contract | |

| **11. Storage** | | | | | |
|---|---|---|---|---|---|
| Reservoir name | Spilled this year | Feet below spillway at maximum storage | Completely emptied | Feet below spillway at minimum storage | Method used to measure water level |
| Lauro Dam | No | 0 | No | 0 | No data collected |

| **Conservation of Water** | |
|---|---|
| 12. Are you now employing water conservation efforts? | No |
| Description of water conservation efforts | |
| 13. Amount of water conserved | |

| **Water Quality and Wastewater Reclamation** | |
|---|---|
| 14. During the period covered by this Report, did you use reclaimed water from a wastewater treatment facility, water from a desalination facility, or water polluted by waste to a degree which unreasonably affects the water for other beneficial uses? | Yes |
| 15. Amount of reclaimed, desalinated, or polluted water used | |

| **Conjunctive Use of Groundwater and Surface Water** | |
|---|---|
| 16. During the period covered by this Report, were you using groundwater in lieu of available surface water authorized under your permit? | No |
| 17. Amounts of groundwater used | |

| **Additional Remarks** |
|---|

All the runoff from Lauro Creek is diverted upstream of Lauro Reservoir each year. A portion of the watershed drains into Lauro Reservoir Debris Basin. When the water enters the basin it filtrates through rocks and coarse sand material, which reduces contaminants in the water. In 2008,Cachuma Operation and Maintenance Board (COMB) upgraded the debris basin dam and pump system. The water that flows into Lauro Debris basin is routed through the reservoir storm drain into the Lauro Reservoir spillway and then flows into San Roque Creek. San Roque Creek is an alluvial channel and a portion of the streamflow infiltrates into the Foothill groundwater basin. Two City of Santa Barbara wells (a Cachuma Project member unit) occur downstream of the discharge point and extract water from the foothill basin: San Roque Park Well and the Hope Well. Runoff from the other portion of the Lauro Dam watershed (0.17 square miles) flows into Lauro Reservoir and is diverted through the Lauro Dam outlet works for treatment and delivery to domestic and agricultural customers.

| Attachments | | |
|---|---|---|
| **File Name** | **Description** | **Size** |
| USGS 11120500 San Jose C Nr Goleta CA.xlsx | USGS Station 11120500 | 2 MB |
| Lauro Creek Diversion Volumes_2019.docx | Lauro Creek Diversion | 15 KB |

| Contact Information of the Person Submitting the Form | |
|---|---|
| First Name | Claire |
| Last Name | Hsu |
| Relation to Water Right | Primary Owner of Record |

| Information on Certification and Signatory | |
|---|---|
| Name of Person Signing and Certifying the Report | Claire Hsu |
| Date of Signature | 03/25/2020 |

## Lauro Creek (11761, 11762) Diversion Volume - Calendar Year 2019

| Year | Month | San Jose Creek Monthly Streamflow (5.54 square miles) (AF) | Lauro Creek - Diverted for Recharge (0.26 square miles) (AF) | Lauro Creek - Area Diverted for Potable Use (0.17 square miles) (AF) | Total Diversion (AF) |
|------|-------|------|------|------|------|
| 2019 | 1 | 499.11 | 23.42 | 15.32 | 38.74 |
| 2019 | 2 | 855.64 | 40.16 | 26.26 | 66.41 |
| 2019 | 3 | 533.42 | 25.03 | 16.37 | 41.40 |
| 2019 | 4 | 47.43 | 2.23 | 1.46 | 3.68 |
| 2019 | 5 | 48.66 | 2.28 | 1.49 | 3.78 |
| 2019 | 6 | 19.04 | 0.89 | 0.58 | 1.48 |
| 2019 | 7 | 5.34 | 0.25 | 0.16 | 0.41 |
| 2019 | 8 | 4.05 | 0.19 | 0.12 | 0.31 |
| 2019 | 9 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2019 | 10 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2019 | 11 | 0.04 | 0.00 | 0.00 | 0.00 |
| 2019 | 12 | 51.04 | 2.40 | 1.57 | 3.96 |
| **Total** | | **2063.75** | **96.85** | **63.33** | **160.18** |

# Exhibit 6

**[SUMMARY OF FINAL SUBMITTED VERSION]**

## PROGRESS REPORT BY PERMITTEE FOR 2020

Primary Owner: U.S. BUREAU OF RECLAMATION
Primary Contact:

Date Submitted: 04/30/2021

Application Number: A011761
Permit Number: 011311

| Source(s) of Water | POD Parcel Number | County |
|---|---|---|
| LAURO CREEK | | Santa Barbara |

MAX Direct Diversion Rate: 15 CFS
MAX Collection to Storage: 500 AC-FT
Face Value: 11359.7 AC-FT

| Permitted Use(s) | Acres | Direct Diversion Season | Storage Season |
|---|---|---|---|
| Domestic | 0 | 01/01 to 12/31 | 10/01 to 06/30 |
| Irrigation | 24300 | 01/01 to 12/31 | 10/01 to 06/30 |

| 1. Compliance with Permit Terms and Conditions | |
|---|---|
| I have reviewed my water right permit and I am complying with all terms and conditions | Yes |
| Description of noncompliance with terms and conditions | |

| 2. Changes to the Project | |
|---|---|
| Intake location has been changed | |
| Description of intake location changes | |
| Type of use has changed | |
| Description of type of use changes | |
| Place of use has changed | |
| Description of place of use changes | |
| Other changes | |
| Description of other changes | |

| 3-5. Permitted Project Status | |
|---|---|
| Project Status | Not Complete |
| 5a. Construction work has commenced | Yes |
| 5b. Construction is completed | No |
| 5c. Beneficial uses of water has commenced | No |
| 5d. Project will be completed within the time period specified in the permit | No |
| 5e. Explanation of work remaining to be done | Reclamation submitted a time extension petition to the State Board in June 2012. |
| 5f. Estimated date of completion | 12/31/2030 |

| 6. Purpose of Use | |
|---|---|
| Domestic | incidental |
| Irrigation | |

| Irrigated Crops | | | |
|---|---|---|---|
| | Multiple Crops | Area Irrigated (Acres) | Primary Irrigation Method |
| Other: Mixed Crops | Yes | 0 | |

| Special Use Categories | |
|---|---|
| C1. Are you using any water diverted under this right for the cultivation of cannabis? | No |

### 7. Amount of Water Diverted and Used

| Month | Amount directly diverted (Acre-Feet) | Amount diverted or collected to storage (Acre-Feet) | Amount used (Acre-Feet) |
|---|---|---|---|
| January | 0.62 | 0.95 | 1.56 |
| February | 0.63 | 0.97 | 1.6 |
| March | 4.39 | 6.71 | 11.1 |
| April | 11.75 | 17.97 | 29.72 |
| May | 0.56 | 0.86 | 1.42 |
| June | 0.24 | 0.36 | 0.6 |
| July | 0.06 | 0.09 | 0.15 |
| August | 0.02 | 0.04 | 0.06 |
| September | 0 | 0 | 0 |
| October | 0 | 0 | 0 |
| November | 0 | 0 | 0 |
| December | 0.28 | 0.43 | 0.71 |
| Total | 18.55 | 28.38 | 46.92 |
| Type of Diversion | Both Direct Diversion and Diversion to Storage | | |
| Comments | The volume of water diverted is estimated based on the area-weighted runoff method using the San Jose Creek USGS gaging station (11120500 SAN JOSE C NR GOLETA CA). Permits 011311 (A011761) and 011312 (A011762) report on the same water. To avoid the appearance of double-counting, all estimated water use is reported under Permit 011311. Please see attachment for explanation of Lauro Dam water diversion and use. The amounts listed in the attachment as Diverted for Recharge are reported here under "Amount diverted or collected to storage," and the amounts listed as Diverted for Potable Use are reported under "Amount directly diverted." | | |

### 8. Water Diversion Measurement

| | |
|---|---|
| a. Required to measure as of the date this report is submitted | Yes |
| b. Is diversion measured? | No |
| c. An alternative compliance plan was submitted to the division of water rights on | |
| d. A request for additional time was submitted to the division of water rights on | |

### Measurement Attachments

| Measurement ID Number | File Name | Description | Size |
|---|---|---|---|
| No attachments | | | |

### Measurement Data Files

| Measurement ID Number | File Name | Description | Size |
|---|---|---|---|
| No data files | | | |

### 9. Maximum Rate of Diversion

| Month | Rate of Diversion |
|---|---|
| January | |
| February | |
| March | |
| April | |

| | |
|---|---|
| May | |
| June | |
| July | |
| August | |
| September | |
| October | |
| November | |
| December | |

| 10.Water Transfers | |
|---|---|
| 10a. Water transfered | No |
| 10b. Quantity transfered (Acre-Feet) | |
| 10c. Dates which transfer occurred | / to / |
| 10d. Transfer approved by | |

| Water Supply Contracts | |
|---|---|
| 10e. Water supply contract | No |
| 10f. Contract with | |
| 10g. Other provider | |
| 10h. Contract number | |
| 10i. Source from which contract water was diverted | |
| 10j. Point of diversion same as identified water right | |
| 10k. Amount (Acre-Feet) authorized to divert under this contract | |
| 10l. Amount (Acre-Feet) authorized to be diverted in 2020 | |
| 10m. Amount (Acre-Feet) projected for 2021 | |
| 10n. Exchange or settlement of prior rights | |
| 10o. All monthly reported diversion claimed under the prior rights | |
| 10p. Amount (Acre-Feet) of reported diversion solely under contract | |

| 11. Storage | | | | | |
|---|---|---|---|---|---|
| Reservoir name | Spilled this year | Feet below spillway at maximum storage | Completely emptied | Feet below spillway at minimum storage | Method used to measure water level |
| Lauro Dam | No | 0 | No | 0 | No data collected |

| Credits Claimed | | | |
|---|---|---|---|
| | Conservation | Reclaimed Water Use | Conjunctive Groundwater Use |
| Claimed? (Yes/No) | No | No | No |
| January | | | |
| February | | | |
| March | | | |
| April | | | |
| May | | | |
| June | | | |
| July | | | |
| August | | | |
| September | | | |
| October | | | |
| November | | | |
| December | | | |

| Conservation Supporting Information | |
|---|---|
| Description of conservation methods | |
| Description of baseline water use and time period | |
| Description of conservation calculation methods | |
| Conserved water used? | |

| Additional Remarks |
|---|
| A Reclamation water rights staff member experienced a catastrophic computer failure the week of March 28, thus several reports are submitted after the April 1 due date. Reclamation does not collect crop data. |

| Attachments | | |
|---|---|---|
| **File Name** | **Description** | **Size** |
| USGS 11120500 San Jose C Nr Goleta CA.xlsx | 2020 Data | 30 KB |
| CY 2020 - Lauro Creek and West Glen Annie Creek Diversion Volumes.pdf | 2020 Diversion and Use | 197 KB |

| Contact Information of the Person Submitting the Form | |
|---|---|
| First Name | Vanessa |
| Last Name | Emerzian |
| Relation to Water Right | Primary Owner of Record |

| Information on Certification and Signatory | |
|---|---|
| Name of Person Signing and Certifying the Report | Vanessa Emerzian |
| Date of Signature | 04/30/2021 |

# CACHUMA OPERATION & MAINTENANCE BOARD

## MEMORANDUM

| Date: | January 4, 2021 |
|---|---|
| Submitted by: | Joel Degner, Elijah Degner |
| Approved by: | Janet Gingras |

**SUBJECT:**      Lauro Creek (11761, 11762) and West Glen Annie Creek (11989) Calendar Year 2020 Diversion Volumes

**Lauro Creek (11761, 17762)**

All the runoff from Lauro Creek is diverted upstream of Lauro Reservoir each year. A portion of the watershed (0.26 square miles) drains into Lauro Reservoir Debris Basin. When the water enters the basin it filtrates through rocks and coarse sand material, which reduces contaminants in the water. In 2008, Cachuma Operation and Maintenance Board (COMB) upgraded the debris basin dam and pump system. The water that flows into Lauro Debris basin is routed through the reservoir storm drain into the Lauro Reservoir spillway and then flows into San Roque Creek. San Roque Creek is an alluvial channel and a portion of the streamflow infiltrates into the Foothill groundwater basin. Two City of Santa Barbara wells (a Cachuma Project member unit) occur downstream of the discharge point and extract water from the foothill basin: San Roque Park Well and the Hope Well. Runoff from the other portion of the Lauro Dam watershed (0.17 square miles) flows into Lauro Reservoir and is diverted through the Lauro Dam outlet works for treatment and delivery to domestic and agricultural customers. The volume of water diverted in 2020 is estimated based on the area-weighted runoff method using the San Jose Creek USGS gaging station (11120500 SAN JOSE C NR GOLETA CA). This is the stream gaging station and method on which the original water right was based. Table 1 provides the monthly diverted volumes for each subwatershed in Lauro Creek and the overall total volume.

**Glen Annie Creek (11989)**

All the runoff from West Glen Annie Creek is diverted into Glen Anne Dam. Water diverted into the reservoir is released through the Glen Anne Dam outlet works into Glen Annie Creek. During large inflow events Glen Anne Dam attenuates the peak inflows, which results in a lower and longer release into Glen Annie Creek, which allows more water to recharge the Goleta Groundwater Basin downstream. The downstream groundwater basin is in the Goleta Water District Service Area (a Cachuma Project member unit). The volume of water diverted in 2020 is estimated based on the area-weighted runoff method using the San Jose Creek USGS gaging station (11120500 SAN JOSE C NR GOLETA CA). This is the stream gaging station and method on which the original water right was based. Table 2 provides the monthly diverted volumes for West Glen Annie Creek.

**Table 1. Lauro Creek (11761, 11762) Diversion Volume - Calendar Year 2020**

| Year | Month | San Jose Creek Monthly Streamflow (5.54 square miles) (AF) | Lauro Creek - Diverted for Recharge (0.26 square miles) (AF) | Lauro Creek - Area Diverted for Potable Use (0.17 square miles) (AF) | Total Diversion (AF) |
|---|---|---|---|---|---|
| 2020 | 1 | 20.15 | 0.95 | 0.62 | 1.56 |
| 2020 | 2 | 20.67 | 0.97 | 0.63 | 1.60 |
| 2020 | 3 | 142.97 | 6.71 | 4.39 | 11.10 |
| 2020 | 4 | 382.95 | 17.97 | 11.75 | 29.72 |
| 2020 | 5 | 18.33 | 0.86 | 0.56 | 1.42 |
| 2020 | 6 | 7.76 | 0.36 | 0.24 | 0.60 |
| 2020 | 7 | 1.96 | 0.09 | 0.06 | 0.15 |
| 2020 | 8 | 0.79 | 0.04 | 0.02 | 0.06 |
| 2020 | 9 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2020 | 10 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2020 | 11 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2020 | 12 | 9.14 | 0.43 | 0.28 | 0.71 |
| **Total** | | **604.73** | **28.38** | **18.56** | **46.94** |

**Table 2. West Glen Annie Creek (11989) Diversion Volume - Calendar Year 2020**

| Year | Month | San Jose Creek Monthly Streamflow (5.54 square miles) (AF) | West Glen Anne Creek - Diversion (0.56 square miles) (AF) |
|---|---|---|---|
| 2020 | 1 | 20.15 | 2.04 |
| 2020 | 2 | 20.67 | 2.09 |
| 2020 | 3 | 142.97 | 14.45 |
| 2020 | 4 | 382.95 | 38.71 |
| 2020 | 5 | 18.33 | 1.85 |
| 2020 | 6 | 7.76 | 0.78 |
| 2020 | 7 | 1.96 | 0.20 |
| 2020 | 8 | 0.79 | 0.08 |
| 2020 | 9 | 0.00 | 0.00 |
| 2020 | 10 | 0.00 | 0.00 |
| 2020 | 11 | 0.00 | 0.00 |
| 2020 | 12 | 9.14 | 0.92 |
| **Total** | | **604.73** | **61.13** |